[NOTE. Cases cited under this title will be found arranged in alphabetical order under the names of the vessels; e. g. "Surplus & Remnants of the Ship Edith. See The Edith."]

SURRATT (UNITED STATES v.). See Case No. 16,423.

## Case No. 13,630.

### The SUSAN.

[1 Spr. 499; [1] 22 Law Rep. 531.]

District Court, D. Massachusetts. Oct., 1859.

PILOTS — SALVAGE — REQUEST FOR ASSISTANCE — RIGHT TO REFUSE—CONTRACT FOR SERVICE —POLICY IN FIXING COMPENSATION.

1. When a vessel is in such peril as to be the subject of salvage service, a pilot, by the general law, is not bound to give his aid for mere pilotage.

[Cited in Flanders v. Tripp, Case No. 4,854.]

2. If, in such case, the vessel hoist her colors at the fore topmast head, it will be deemed a request for assistance, although it be the usual signal for a pilot.

3. Salvors cannot force themselves upon a vessel in distress, against the will of the mas-

[1] [Reported by F. E. Parker, Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission.]

ter. It is at his option to accept their service or not.

[Cited in The Choteau, 9 Fed. 211; The Cherokee, 31 Fed. 169.]

4. But, if he has requested their assistance by a signal of distress, or otherwise, and they have incurred danger, expense or labor, in compliance with such request, and their aid has then been refused, it seems, they have a right to some compensation, at least if the vessel ultimately comes to a place of safety.

[Cited in Pope v. The Sapphire. Case No. 11,276; The Williams, Id. 17,710; The Louisa Jane. Id. 8.532; The New Orleans, 23 Fed. 910.]

5. Where aid in saving a vessel from a sea-peril is rendered, under a contract, it is a salvage service, unless, by the terms of the contract, the compensation is to be absolute, and not contingent upon success.

[Cited in Camanche v. Coast Wrecking Co., 8 Wall. (75 U. S.) 478; The Williams, Case No. 17,710; The Louisa Jane, Id. 8,532; Baker v. Hemenway, Id. 770.]

6. In fixing the amount of salvage compensation, it is proper to take into view the policy of encouraging competent persons, on a dangerous coast, to associate together and keep themselves prepared with boats and other appliances, to render prompt assistance to vessels in distress.

In admiralty.

J. Wilder May, for libellants.
E. F. Hodges, for claimant.

SPRAGUE, District Judge. This was a libel for salvage. I have no doubt that this vessel was in such peril as to be the subject of salvage-service, and that the libellants went on board from the shore, and aided in bringing her to a place of safety. But it is insisted that they are not entitled to a salvage compensation, because it was understood between them and the master, before and at the time the assistance was rendered, that it was to be merely pilotage.

This requires examination. It appears that, on the 6th of February, this vessel made sail from Holmes' Hole, bound for Boston. After proceeding about fifteen miles, her lumber ports were stove in by sheet ice, and in five minutes she was filled with water, and sunk as low as her cargo of lumber would permit. Her cabin and her rails were submerged, and only the extremities of the stern and bow, and the upper part of the deck-load of lumber were above water. The crew could have neither fire nor shelter, and most of their clothing was wet. The water flowed into her so freely, that no attempt was made to free her from it by the pumps or otherwise. In this condition she made a signal of distress, and was soon afterwards taken in tow by the brig Rebecca, belonging to the same owner. The weather being mild for the season, and the wind moderate, some consultation was had between the masters of the two vessels, about proceeding to Boston; but it was concluded that the Susan should go into Monomoy Point. The master of the Susan was on board of the Rebecca, and her flag was then hoisted at the fore

topmast head as a signal. Upon seeing this, eight of the libellants proceeded in a boat toward the Rebecca; and as they approached her, the master of the Susan inquired if they had a pilot, to which one of them, James Colson, replied that he could take her in, referring to the Susan, then water-logged and in tow.

There is testimony that Captain Lowd, the master of the Susan, said that a pilot was all that he wanted, and that he needed no other assistance. But it is not stated that any response was made to this by any of the libellants, and I am not satisfied that it was said to them or made known to them, so that they understood or ought to have understood that whatever they should do would be only as pilots, and for mere pilotage compensation.

Immediately after getting on board of the Rebecca, she and her tow, by advice of Colson, were taken into shoaler water, and there anchored as a place less in danger from ice, until the tide should favor her going into harbor. In the meantime, four of the libellants, at the request of Captain Lowd, took the steward of the Susan and the clothes of her crew on shore, and afterwards returned. While this boat was absent, the Rebecca departed and kept on her voyage. Soon after the return of the boat, with the aid of the libellants the anchor of the Susan was weighed, and she attempted to get into the harbor of Monomoy, steering partly by her rudder, and partly by her sails. Being very deep in the water she took the ground; thereupon a part of the libellants went in her boat to the light ship, half a mile distant, obtained a kedge anchor, and aided in kedging her off the shoal and into the harbor. These were, in their nature, salvage services. In weighing the evidence, with a view to determine whether the libellants were by agreement restricted to the mere compensation of a single pilot, all the circumstances should be taken into consideration. No one of the libellants was a pilot by commission or appointment; and if they had been, the Susan was in such condition that they would not, by the general law, have been bound to go on board and aid in getting her into port, merely as pilots. The Hebe, 2 W. Rob. Adm. 247. The presumption, therefore, is, that the service was understood by the parties to be salvage, unless it be shown by satisfactory evidence that there was a different agreement. In The Haedwig, 24 Eng. Law. & Eq. 582, a vessel in a condition to be the subject of salvage service made a signal for a pilot, by hoisting her colors at the fore topmast head, as in the present case, and when a boat came alongside, the master of the vessel said he wanted one man as a pilot; and the boat's crew—none of whom were commissioned pilots—aided in getting the vessel into port, it was held that they were entitled to salvage. Dr. Lushington, in giving his judgment, declared that he should hold a signal, under such cir-

cumstances, to be a signal for assistance, and not for a pilot, and awarded salvage. He does not notice the fact, stated in the protest which was in evidence, that the master of the vessel said to the boat that he wanted one man as a pilot, but construed the signal as a request for assistance; and, as the assistance needed and actually rendered was in its character salvage, and not mere pilotage, he decreed a salvage compensation. It may, perhaps, be inferred, that in his view, the receiving of such assistance overruled the mere declaration that a pilot only was wanted. The cases Lea v. The Alexander [Case No. 8,153], and Callagan v. Hallett, 1 Caines. 104, were decided not upon the general law, but upon the positive enactments of a New York statute. It is true, salvors cannot force themselves upon vessels in distress, against the will of the master. It is at his option to accept their services or not; and if he refuse them, compensation cannot be recovered for assistance subsequently rendered against his will. I am not speaking of cases in which the master fraudulently attempts to destroy his vessel; for in the present case there is no doubt of his good faith toward the owners and underwriters. If the aid of salvors be accepted only upon a clearly understood condition that it shall be deemed merely pilotage, they will be limited to mere pilotage compensation. But I hold, with Dr. Lushington, that a signal, made by a vessel in actual distress, and needing other assistance than pilotage, although it be the usual signal for a pilot, shall be deemed a signal for assistance.

In such case, the vessel has no right to make a signal merely for a pilot. Pilots are not bound, unless by statute, to take the hazards, or subject themselves to the labor of going on board, and aiding such a vessel, for mere pilotage compensation. But suppose such a signal is made, or an actual signal of distress is held out, and persons are thereby induced to go on board to render assistance, and then the master of the vessel, who has made the signal, refuses to accept their services, or will receive them only upon conditions to which they are under no obligation to accede, are they to be entitled to no compensation? This, I believe, is a new question, although such a state of facts has sometimes actually existed.

A signal of distress is a request for assistance. And, if competent persons, upon such request, subject themselves to labor and danger, and expense, to get on board of the vessel, and there offer their services for such reward as the law will give them, if such offer be rejected, it would seem that some compensation should be made for the labor, expense, and danger so incurred; at least, in cases where the vessel subsequently comes to a place of safety. Several cases have heretofore been presented to me, where boats have put off from the shore to vessels making a signal of distress, with great gallantry and hazard to life, in launching through the surf, and where the subsequent service of getting the ship out of danger was comparatively trifling. The chief merit, and principal ground of compensation, was their great courage, skill, and danger in reaching the ship; and I should be slow to believe that, in such case, they would be deprived of all reward, at the option of the master in rejecting their services, after reaching his ship. But, in the present case, this question need not be decided, and comes into view only in giving construction to the acts of the parties, in order to determine in what character the libellants really acted. In my opinion, their services were not refused, nor accepted upon condition that they should be deemed mere pilotage, but were properly rendered by them as salvors.

It is true that these services were rendered upon the request of the master, and with some understanding; that is, under a contract with him. And it is sometimes said that the service is not salvage, if performed under a contract. This is quite inaccurate; and it is important that the error should be pointed out.

In much the greater number of salvage cases, the services performed are by agreement; that is, a contract between the salvors and the agent of the owners. Take the common case of a vessel in peril, sending a boat's crew ashore for assistance, and upon their request, and by mutual agreement, certain persons, with a boat, or a sailing vessel, or steamer, render the desired assistance, nothing being said about compensation. The law declares what the compensation should be, viz., meet and suitable salvage, if property be saved; and no pay, if nothing is saved. But it is competent for the parties to go further in their contract, and stipulate what the compensation shall be. They may agree that, if the property be saved, a specified sum shall be paid. That is still a salvage compensation, although the amount is fixed by the previous agreement of the parties. They may agree that compensation shall not be dependent upon success, but payable, at all events, for the time and labor bestowed, whether property be saved or not. By such agreement, the compensation, not being contingent upon the safety of the property, is not salvage. But the party who asserts that there was a contract which displaces salvage, assumes the burden of proving affirmatively the existence of such contract. It is not sufficient for him to show that there was some contract; but he must go further, and prove that it was agreed that the compensation should be absolute, and not contingent, otherwise the law will say that it was to be contingent upon the saving of property.

The cases of Hennessey v. The Versailles [Case No. 6,365], and The Independence [Id 7,014], rest upon these principles. On land, the law is otherwise. If a person requests another to labor in saving his crops, or other

property, from danger and loss, and nothing is said of compensation, the employer is to pay a reasonable amount, at all events.

But here, again, the parties may, by their express contract, make the compensation contingent upon success. For land services, the law gives a quantum meruit, without regard to success, unless it appears that the parties had made a different agreement.

But for services in rescuing property from perils of the sea, the law gives no compensation, unless the property is saved. And the error into which some learned lawyers have fallen, as to the right to salvage, is in looking at the subject only by the light of common law doctrines applicable to services on land. In the present case, it is not proved that there was a special agreement for an absolute compensation, or fixing the amount.

It remains only to consider what amount shall be awarded. The vessel and cargo were worth about $5000. The time occupied by the eight libellants who first went to the Susan, was from ten o'clock in the morning, till twelve at night. Thirteen others of the libellants went on board, about eight o'clock in the evening, and continued to aid, or were ready to aid, until twelve o'clock; but I do not think the assistance of so many was by any means necessary. The labor and hazard were inconsiderable, but the service was promptly rendered, and the compensation was contingent.

There is one element which I have heretofore taken into view, in some cases, and which is not to be wholly overlooked in this. It is that encouragement should be given to competent persons, upon dangerous parts of our coast, to associate together, and keep themselves organized, with suitable boats and other appliances, to render prompt and efficient assistance to vessels in distress. Decree for $250 and costs.

NOTE. That the salvors have no right to act against the will of the master, see Clark v. The Dodge Healey [Case No. 2,849]; The Bee [Id. 1,219]. That pilots are not bound to give their aid, for mere pilotage, to a vessel in such peril as to be the subject of salvage service, see The Elizabeth, 8 Jur. 365; The Persia, 1 Spinks. 166; The Frederick, 1 W. Rob. Adm. 17; The King Oscar, 6 Notes of Cas. 284; The Hedwig, 1 Spinks, 19; The Joseph Harvey, 1 C. Rob. Adm. 306; The Industry, 3 Hagg. Adm. 203; The Star, 14 Law Rep. 487; The Centurion [Case No. 2,554]; The Adventurer, Stu Adm. 101; Hobart v. Drogan, 10 Pet. [35 U. S.] 117. In the late case of The Undaunted (decided by Dr. Lushington, in the court of admiralty, June 21st, 1860), 2 Law T. [N. S.] 520, the Undaunted, troop-ship, bound to London, in coming to, in a heavy gale, at the North Foreland, parted with both her anchors and cables. Sail was made on the ship, and rockets fired for assistance. The steamer Resolute came up, and the master of the Undaunted requested the steamer to proceed to the nearest harbor and bring off an anchor and cable. The steamer went to Ramsgate, and as the best means of executing the order, engaged two luggers, and put on board of them an anchor and cable. During the next three days, the steamer and luggers searched for the Undaunted, without success, she having run to the northward, and got ready her spare anchor. In the afternoon of the third day, the steamer fell in with her, and with the aid of another steamer towed her to Gravesend, where the luggers came up with her, and her master refused to accept the anchor and chain from them.

The action was brought by the owners and crew of the steamer and luggers, claiming salvage for all these services. The learned judge gave £400 to the steamer, and £100 to each lugger, and in deciding the case said: "There is a broad distinction between salvors who volunteer to go out, and salvors who are employed by a ship in distress. Salvors who volunteer, go out at their own risk, for the chance of earning reward, and if they labor unsuccessfully, they are entitled to nothing; the effectual employment of salvage service is that which gives them a title to salvage remuneration. But if men are engaged by a ship in distress, whether generally or particularly, they are to be paid according to their efforts made, even though the labor and service may not prove beneficial to the vessel."