**David SANDS d/b/a Sand Towing and Salvage, et al., Plaintiffs,**

v.

**ONE UNNAMED 23′ SEACRAFT, PLEASURE VESSEL, etc., et al., Defendants.**

**No. 96–717–Civ–Orl–3ABF(19).**

United States District Court,
M.D. Florida,
Orlando Division.

March 12, 1997.

Patricia K. Olney, Stromire, Bistline, Miniclier, McDermott & Griffith, Cocoa, FL, Andrew W. Anderson, Keller & Houck, P.A., Miami, FL, for David Sands.

John Robert McDonough, McDonough, O'Dell, Beers, Wieland, Williams & Krakar, Orlando, FL, Patricia K. Olney, Stromire, Bistline, Miniclier, McDermott & Griffith, Cocoa, FL, for International Towing and Salvage, Inc.

Eric H. Faddis, Law Office of Eric H. Faddis, P.A., Orlando, FL, for One Unnamed 23′ Seacraft Pleasure Vessel.

Craig I. Kartiganer, Law Offices of James G. Gilmour, Miami, FL, for USAA.

Gregory Paul Smith, Faddis, Oldham & Smith, P.A., Orlando, FL, for Eric H. Faddis.

Eric H. Faddis, Faddis, Oldham & Smith, P.A., Orlando, FL, pro se.

BAKER, United States Magistrate Judge.

## ORDER

### Salvage Fever [1]

*I must go down to the seas again, to the lonely sea and the sky,*
*And all I ask is a Bud, a boat and Loran to steer her by,*
*And the wheel's kick and the wind's song and the T–top's shaking,*
*And a grey mist on the sea's face and a grey dawn breaking.*

*I must cut across the Shoals again to the vibrant harbor light*
*To the sheltered lee of the Cape, out of the wind's cutting bite.*
*And all I get is a windy day with the white clouds afloat,*
*With darkening skies at dusk and breaking waves to flip my boat.*

*I must go down to the seas again, for my boat is on its side,*
*Its salvage is a wild call, one that may not*

---

1.  With great apologies to John Masefield.

*be denied.*
*And all I ask is a judgment and payments*
*to restore her,*
*And quiet sleep and a sweet dream when*
*the long suit's over.*

This matter comes before the Court for final disposition, after a trial to the court, sitting in admiralty. Plaintiff David Sands d/b/a Sands Towing & Salvage, Inc. (herein "Sands") and International Towing & Salvage, Inc. (herein "International") filed this *in rem* action seeking to establish an award for salvage as a result of their efforts in salvaging the 23′ Seacraft Vessel (herein "the vessel") skippered by Eric H. Faddis (herein "Faddis") on March 5, 1995; and seeking an *in personam* recovery against the vessel's insurer, United States Automobile Association (herein "USAA"). Faddis has counterclaimed for negligent salvage, claiming that the salvors' negligence in the salving efforts caused the loss of the vessel's T–Tower and center console (the "t-top"). USAA has filed a "counterclaim for interpleader" against the Plaintiffs, and a third party claim against Faddis (who has asserted an equitable right in the vessel) and Fred Chamberlin (the holder of the legal title to the vessel) seeking to limit its liability to the $1,375.00 check tendered, but not negotiated, in this matter.

In addition to the salvage award, the salvors seek a premium on their award, as well as an award of attorney's fees and costs incurred in this litigation. Faddis, in addition to his damage claim, seeks attorneys fees and costs. USAA also seeks attorneys fees and costs.[2]

The Court, having heard two days of trial testimony, having reviewed the four volumes of pleadings and papers which constitute the record in this matter, and having reviewed the applicable law, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

*Oh sit right back and you'll hear a tale*
*A tale of a fateful trip*
*That started from this tropic port*
*Aboard Defendant Ship*

According to the stipulated facts filed by the parties and the testimony and evidence presented at trial:

1. On March 5, 1995, at approximately 4:15 p.m., Faddis capsized the vessel in the Southeast Shoals off Cape Canaveral.

2. The vessel is an open fisherman styled recreational vessel and was equipped with a center console and a T–tower. The T–tower consisted of a T–top with an upper control station. The T–top portion of the tower included a large canvas top.

3. Testimony of the builder established that the T–tower was secured to the deck at approximately six points along the perimeter of the center console using screw and quarter inch aluminum pads. There were no backing plates beneath the deck securing the legs to the hull. The T–tower was secured to the console, however, with backing plates and bolts. The T–tower was constructed of one and one quarter inch aluminum piping, and reached a height of approximately eleven feet above the deck of the vessel and extended approximately eight feet above the vessel's gunnels. Accordingly, the "draft" of the capsized vessel was approximately eleven feet.

---

**2.** Though not strictly necessary for determination of this case, a few words are in order regarding the litigation as it reflects on the parties and our litigious society. This case involved a recreational fishing boat. Its skipper took a short cut through treacherous shoals in high seas. He suffered a predictable fate: the capsizing of his boat, imperiling himself, his passengers, his boat and those who came to his aid. Fortunately, the people were rescued without incident. As businessmen, the salvors were present to retrieve the boat and did so, delivering it structurally intact to a repair yard.

No one was hurt. The boat was insured, and the insurer went out of its way to apply various coverages so as to minimize the owner's loss. A check was tendered to cover the salvage services, which under the circumstances seem a bargain. A dispute ensued over the quality of the salvage services. Despite a truncated discovery and pretrial regimen, resolution of that dispute entailed two days of trial with six attorneys and their clients.

The performance of the attorneys in preparing for and conducting the trial was technically excellent. Unfortunately, the array of evidence, experts and detailed arguments presented were worthy of a more noble dispute. In the context of this incident, those efforts were disproportionate.

*The skipper's name was Faddis*
*A lawyer, if you please*
*He took two friends out fishing*
*And dumped them in the sea*

4. Although Faddis did not have legal title to the vessel, which was in the name of Fred Chamberlin, Faddis has asserted and this Court so finds that Faddis had an equitable interest in the vessel, as Faddis provided the funds for the purchase and outfitting of the vessel. At the time of the loss, Faddis had spent $22,942.20 on the vessel, including its hull, T–tower, rocket launcher seating, and engine.[3] Faddis testified that he was a recreational boater of some experience, including prior capsizings, with different vessels. Faddis consumed six beers during the trip.

5. On the day the loss occurred, Faddis and two passengers had taken the vessel approximately 25 miles offshore on a fishing trip, before returning towards Port Canaveral. Capt. Darren Schuster, operator of a charter fishing vessel, the "Ocean Obsession," observed the vessel late in the afternoon, steering in a southwesterly direction towards the Southeast Shoals.

6. The Shoals are located approximately five to eight nautical miles east of the entrance to Port Canaveral. According to the charts, testimony and other evidence presented, the Shoals are identified as that body of water where the water depth is less than thirty feet. The charts and testimony confirm that the water depth in the Shoals decreases as one travels from east to west, from thirty feet to seven feet, and shallower. It is common knowledge among mariners in the area that the Shoals are dangerous, due to the water action and shallow depth.

7. Capt. Schuster observed the vessel turn to a westerly direction and enter the Shoals. Capt. Schuster then lost sight of the vessel. Upon entering the Shoals, Faddis testified that he encountered a large swell of eight to ten feet. The vessel capsized in the Southeast Shoals as the wave broke. All three men were thrown overboard.

8. Approximately fifteen minutes after the vessel capsized, as Ocean Obsession continued on toward Port Canaveral, Capt. Schuster observed a person wearing red clothing sitting atop the capsized vessel, which was now upside-down. Capt. Schuster was not able to approach closer than 100 yards of the vessel due to the presence of breaking waves and shallow water, and did not provide direct assistance due to shoal conditions, though he remained at the scene.

9. Capt. Schuster called a Mayday into the United States Coast Guard, advising it of the capsized vessel. The Coast Guard issued an Urgent Marine Information Broadcast, advising mariners of the capsized vessel and responded with a shallow draft rigid hull inflatable boat. The Coast Guard also requested helicopter support.

10. There was a steady and strong northeast wind, which created a strong southwest current in the vicinity of the southeast shoals. The sea waves in the Shoals were approximately four to six feet, and the swells were six to eight feet and greater.

*The Coast Guard came to pluck them out*
*And Sands, the salvor, came*
*To save the fishing boat Faddis loved*
*The mighty sea craft "Unnamed"*

11. Sands is a professional salvor of considerable experience, located within Port Canaveral. Sands heard the Coast Guard broadcast, and responded, alone, in his salvage vessel—the "Dragon II". The Dragon II is a 41′ vessel rigged for salvage operations, and powered by twin 650 horsepower diesel engines.

12. Sands arrived in the vicinity of the capsized vessel approximately 30 minutes after the Mayday call. The Coast Guard was on the scene, rescuing the passengers. Faddis testified that prior to his rescue, he swam underneath the overturned vessel in an attempt to retrieve his wallet and keys. Faddis said the visibility was five feet, and at the time, he saw the tower and console. One of the passengers had also dived beneath the vessel, and with visibility of three to five feet, saw that the T–tower was present at that time. The last dive the passenger took was

---

**3.** Faddis testified that he had spent additional monies on various electronics for the vessel, but acknowledges that no claim is asserted against Plaintiffs regarding loss of electronic equipment.

10 to 25 minutes prior to the arrival of the Coast Guard.

13. After Faddis and his passengers were rescued by the Coast Guard, Faddis shouted to Sands to rescue the vessel. Faddis also told Sands that the vessel had a T–tower. Sands acknowledged the communication with a hand signal. Sands proceeded to put on a wet suit and prepare a tow line. It is undisputed that no fixed price contract was entered into prior to commencement of salvage.

*But Sands, he did not right the ship*
*He towed her as she lay*
*And "Unnamed" lost her console*
*And T-tower that day*

14. Sands readied the tow line, donned his scuba equipment, including an underwater light, and proceeded to enter the water. Prior to entering the water, Sands received and responded to a call from the Coast Guard. Eventually, Sands entered the water and secured a tow line on the vessel.

15. The vessel had drifted in the strong current. The evidence indicates that the vessel was approximately 80 yards away from the Dragon II at the commencement of the salvage operation.

16. Sea conditions on the Shoals were difficult. Sands swam from the Dragon II to the vessel and secured the tow line to the vessel's bow eye. He then swam around the vessel and beneath the gunnels, in an attempt to salvage personal gear from the vessel. Sands testified that he did not swim completely beneath the vessel because he was concerned with his own safety and the prospect of being struck by the unpredictable movement of the capsized vessel.

17. The vessel had drifted, after capsizing, for about forty-five minutes in the strong southwest current, before the Coast Guard rescued the passengers. Approximately thirty minutes had elapsed between the time of the Coast Guard rescue and the time Sands attached the tow line.

18. Sands testified that the visibility was less than one foot beneath the vessel, and his underwater light was of no assistance. Sands did not see a T–tower or console, but did see cables and wires dangling beneath the hull. After removing the drain plug from the vessel and securing the line, Sands swam back to the Dragon II and rested before commencing to Port Canaveral.

19. Sands contacted Ryan Moore of International, and requested his assistance and escort. He did not attempt to right the vessel at this time.

20. Sands towed the vessel at one and a half to two knots in a west southwest direction, off the Shoals toward Port. Sands testified that when he was off the Shoals outside the breakers and in water with a depth of approximately 30 feet, he attempted to right the vessel. Sands stated that he was able to rotate the vessel to a nearly vertical position, but the bow eye failed before he could bring the hull to a horizontal position. This resulted in the vessel returning to its capsized position.

21. Sands maneuvered the Dragon II back to the vessel, entered the water and fashioned a towing bridle to the vessel, in order to complete the tow.

22. Moore received a phone call from Faddis around 6:15 p.m. that evening, inquiring about the vessel. Moore hailed Sands on the radio and was advised that the tow was underway.

23. Sands requested Moore's escort through the ship channel. At about 8:30 p.m., Moore, in the salvage vessel "Neon Moon" rendezvoused with Sands and provided lighting and escort to the sea wall at International, where Sands moored his salvage vessel and the capsized vessel.

24. On March 6, 1995, Sands and Moore established communications with USAA and a marine surveyor assigned by USAA, regarding disposition of the Vessel. The surveyor, working on behalf of USAA, advised Moore that USAA had insured the vessel and would pay for the salvage. Moore and USAA agreed on an amount not to exceed $1500, and Moore was told to expect payment within 30 days. USAA authorized the righting of the vessel and instructed it to be delivered to a marina for haul-out.

25. The next day, the vessel was righted by Sands and Moore through the use of a front end loader owned by International. After the vessel was righted, she was pumped

out and transported to the marina, as instructed.

26. International submitted an invoice to USAA in the amount of $1400. USAA issued a check in the amount of $1,375,[4] payable to International and Faddis. Faddis refused to negotiate the check and pay International. The salvaged hull and engine were returned to Faddis, who had the vessel rebuilt before it was arrested in this proceeding. Sands and Moore remain unpaid.

> *What caused the loss? How deep the sea?*
> *Expert opinions flew*
> *Another salvor testified*
> *And sailors of the crew*

27. All the experts agreed that a vessel that capsizes on the Shoals is subject to substantial damage, if not timely salvaged. If the vessel had been left in the six to eight foot seas, the T–tower and console would eventually have been lost. Under the conditions that existed on March 5, 1995, all the professional mariners agreed that the vessel faced total destruction, if not promptly removed.

28. The photographs and videotape of the vessel after salvage, reveal minimal damage to the hull. The T–tower was lost with very little visible damage to the screw holes where the legs were fastened or where the tower was affixed with marine adhesive.

29. Several witnesses testified as to the depth of the water at the time of capsizing. Estimates varied from eight feet to Faddis' testimony that he was in 32 feet of water. The precise location and depth at the initial capsizing are immaterial. The boat capsized in the Shoals, and strong winds and current caused the vessel to drift for over an hour before salvage. Until brought under control by Capt. Sands, the boat was helpless and subject to the vagaries of the sea.

30. The vessel, including the console, seating, T–tower and engine, was insured for $21,000. Faddis received policy limits for the hull and engine. He was also reimbursed under other insurance coverages.

---

4. The disparity exists due to USAA's unwillingness to pay for a videotape of the righting of the vessel. The salvors did not contest this markdown.

## CONCLUSIONS OF LAW.

### Plaintiffs' Right to a Salvage Award

■ As commercial salvors with no prior contractual obligation, having rescued the Vessel from an obvious peril, Plaintiffs are entitled to a salvage award. *See, generally, The Blackwall,* 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1869). Three elements are required to establish a valid salvage claim:

1. a maritime peril from which the ship could not have been rescued without the salvor's assistance;

2. a voluntary act by the salvor under no pre-existing official or contractual duty to the owner; and

3. success in saving, or in helping to save at least part of the property at risk.

*Ocean Services Towing & Salvage, Inc. v. Brown,* 810 F.Supp. 1258, 1262 (S.D.Fla. 1993) [internal citations omitted].

Without the efforts of Plaintiffs in removing the Vessel from the Shoals, she would have certainly been lost. Moreover, Plaintiffs were under no preexisting duty to salve the ship, and they were successful in saving what would otherwise have been taken by the sea—the hull and engine.[5] Plaintiffs are entitled to a salvage award.

In determining the amount of the award, the Court need look no further than the testimony of Capt. Moore of International. After the salvage operation was complete, Moore testified that he spoke with USAA's agent and quoted a total price of $1500.00. The Court assumes that Plaintiffs, as professional salvors thoroughly familiar with the particulars of the rescue and the value of their own equipment and that of the property salved, took into account the factors set forth in *The Blackwall,* 77 U.S. (10 Wall.) 1, 19 L.Ed. 870 (1869) in determining the value of their services. The Court declines Plaintiffs' invitation to recalculate the award or to allow a premium. It is true that Plaintiffs expected to be paid promptly. Breach of that

---

5. Although testimony varied as to the likelihood of repairing the engine, at least it was recovered intact, which is more than the Shoals promised.

promise entitles them to interest but not a penalty.

### The Negligence Claim

Faddis, speaking for the Vessel, asserts that the salvors' negligence bars any award and, in fact, entitles Faddis to an award for negligent salvage. This position is not supported by the evidence.

■ The liability of a salvor for damages sustained by a vessel in the course of salvage operations is dependent on the type of damage sustained. Where the injury is "distinguishable," the salvor's duty is measured under a duty of reasonable care under the circumstances. Where the injury is not distinguishable from that which the vessel would have suffered had salvage not been undertaken, the salvor is not liable in the absence of gross negligence or willful misconduct. *The Noah's Ark v. Bentley and Felton Corp.*, 292 F.2d 437, 440–441 (5th Cir.1961).

"A distinguishable injury ... is some type of damage sustained by the salved vessel other than that which she would have suffered had not salvage efforts been undertaken to extricate her from perils to which she was exposed." *Id.* at 441.

■ Here, all agreed that the Vessel was doomed to eventual total destruction, if left to the scant mercy of the Shoals. At the very least, the T–tower and console would certainly have been lost. Thus, the injury suffered by the vessel is not other than one she would have suffered without salvage efforts. The injury was thus, non-distinguishable, rendering the salvors liable only for gross negligence or willful misconduct. *See Furka v. Great Lakes Dredge and Dock Co.*, 755 F.2d 1085, 1089 (4th Cir.1985) (interpreting the higher standard in a rescue context). Faddis has tendered no proof of either.

Although Faddis insists that the vessel "should have" been righted immediately, he presents no proof that such an act: 1) was required to meet the appropriate standard of care, 2) was even possible, in view of sea conditions at the time, or 3) that righting the vessel on the Shoals would have prevented the loss complained of Simply put, Faddis has shown no duty, no breach and no resulting damage.

The Vessel was upside-down, adrift on the Shoals in strong current and winds for over an hour before Sands began the salvage. The only negligence plain on this record is that of Faddis' in capsizing his vessel.

### Liability of USAA

USAA contends, in their trial brief, that Plaintiffs are not entitled to sue it directly in this action, citing Florida's non-joinder statute (Fla Stat. § 627.7262). However, USAA failed to raise that defense in its Answer (Doc. No. 30), and did not present it as an issue in the Joint Pre-trial Statement. *See* Rule 12(b), Fed. R. Civ. Pro., requiring affirmative defenses to be asserted in the responsive pleading. Moreover, USAA filed a counterclaim and third party claim (Doc. No. 31), which essentially acknowledges USAA's liability, and USAA participated fully at trial. Having inserted itself fully into these proceedings, any objection to joinder has been waived.[6]

USAA has not contested the invoiced amount presented by Plaintiffs. Its agent agreed with Moore that salvage fees not to exceed $1500 were appropriate, and Moore was told to expect payment within 30 days. The undisputed testimony is that the Plaintiffs did not receive payment. Plaintiffs are entitled to recover the agreed price, plus interest and costs.[7]

### CONCLUSION

Based on the foregoing, the Court **HOLDS** as follows:

1. That the Plaintiffs are entitled to prevail on their Complaint against the Vessel and that judgment shall be entered on the

---

6. As a practical matter, it is doubtful that the non-joinder statute would be applicable in this case, even if it were as properly raised. *See Cresci v. The Yacht, Billfisher*, 874 F.2d 1550 (11th Cir.1989).

7. USAA states that under the circumstances, a joint check with Faddis and International as payees was USAA's "only reasonable option available." (Doc. No. 87, pg.4). Considering the relatively minor amount involved, when compared to financing a federal lawsuit through trial (especially when liability is acknowledged), the Court is at a loss to understand this statement.

Complaint, in favor of Plaintiffs Sands and International, jointly, and against the Vessel, *in rem*, in the amount of $1500.00, plus prejudgment interest of $360.00 from March 6, 1995 and costs;

2. That such judgment *in rem* is a preferred maritime lien against the vessel, and, as no valid claims of higher priority have been asserted herein, the vessel is due to be condemned and sold to pay the sums due Plaintiffs if those sums are not paid within 15 days;

3. That the Plaintiffs are entitled to prevail on their Complaint against USAA and that judgment shall be entered in favor of Sands and International, jointly, and against USAA, in the amount of $1500, plus prejudgment interest of $360.00 from March 6, 1995 and costs;

4. That the Plaintiffs are entitled to recover from either the Vessel or USAA, but are only entitled to one recovery;

5. That the Vessel, by and through Faddis, take nothing on its counterclaim and judgment be entered in favor of Plaintiffs and against Faddis and the Vessel on the claim for negligent salvage, and that Plaintiffs recover their costs;

6. That USAA's counterclaim and Third Party claim be **DENIED,** consistent with the rulings and findings herein;

7. That the Court shall reserve jurisdiction to determine entitlement, if any, to attorney's fees, upon proper motion;

8. If the judgment is not paid within 14 days the Plaintiff may apply for an Order of Sale.

9. That the Clerk of the Court shall issue judgment consistent with the rulings herein.

*Thus ends the saga of Unnamed*
*Her troubles at a close*
*Unless this order is appealed*
*It's steady as she goes . . . .*