David **EVANOW**; Phillip Albee; Raymond Dunham, Plaintiffs–Appellees,

v.

**M/V NEPTUNE**, a tug, her engines, tackle, machinery & etc., in rem; Barge KRS 160–6, her engines, tackle, machinery, etc., in rem; Dahl Tug & Barge Company; Port Gardner Tug & Barge Co., Inc.; KRS Marine Inc.; Tacoma Boat Building Company, Defendants–Appellants.

David Evanow; Phillip Albee; Raymond Dunham, Plaintiffs–Appellants,

v.

M/V Neptune, a tug, her engines, tackle, machinery & etc., in rem; Barge KRS 160–6, her engines, tackle, machinery, etc., in rem; Dahl Tug & Barge Company; Port Gardner Tug & Barge Co., Inc.; KRS Marine Inc.; Tacoma Boat Building Company, Defendants–Appellees.

Nos. 97–35248, 97–35249.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 14, 1998.

Decided Dec. 21, 1998.

---

Steven V. Gibbons, Gibbons & Associates, Seattle, Washington, for defendants-appellants-cross-appellees.

Richard C. Wootton, Cox, Wootton, Griffin & Hansen, San Francisco, California, for plaintiffs-appellees-cross-appellants.

Before: WALLACE and KOZINSKI, Circuit Judges, and EZRA,* District Judge.

WALLACE, Circuit Judge:

The tug Neptune (in rem), the barge KRS–160–6 (in rem), Dahl Tug & Barge Company, Port Gardner Tug and Barge Company, KRS Marine, and Tacoma Boat Building Company (defendants) appeal from a judgment and an award of costs entered against them after an eight day bench trial before a magistrate judge. Evanow, Albee, and Dunham (plaintiffs) cross-appeal, arguing that the trial court improperly offset their damages. In addition, plaintiffs seek sanctions for a frivolous appeal. The district court had jurisdiction pursuant to 28 U.S.C. § 636(c) and 28 U.S.C. § 1333. We have jurisdiction over these timely filed appeals pursuant to 28 U.S.C. § 1291. We affirm the

* Honorable David A. Ezra, United States District Judge, District of Hawaii, sitting by designation.

judgment, but reverse and remand the award of costs.

## I

This case arises out of a contract to aid the Neptune and its barge when the Neptune was disabled and facing severe storm conditions. The main issues in the appeal are whether the contract is one for salvage, whether the plaintiffs are entitled to recover under the contract, and whether the plaintiffs were negligent in their effort to render aid.

### A.

Tacoma Boat Building Company contracted with Port Gardner Tug & Barge (Port Gardner) to transport a landing craft unit from Tacoma, Washington, to American Samoa. Port Gardner, in turn, entered into a bareboat charter with Dahl Tug & Barge Company for the tug Neptune and another charter with KRS Marine for the barge KRS–160–6.

After inspection of the barge, both vessels set sail in early January 1995 under the command of Captain Church. One evening, the Neptune encountered a major storm and sought refuge in the Crescent City harbor. While in the harbor, the Neptune became disabled and grounded on a sandy shoal. The crew of the Neptune secured the barge alongside the disabled tug.

That night, the storm, which was the worst in the Crescent City area in years, caused gusts up to ninety knots and swells inside the harbor to reach six to eight feet. These conditions pounded the barge against the port side of the tug. Because of the diesel fuel and oil aboard the Neptune as well as hydraulic fluid in the landing craft unit, the Coast Guard Pacific Pollution Strike Team assessed the threat of pollution as "substantial." The Coast Guard also expressed concern that the crew of the Neptune was at risk.

The next day, with the storm still raging, Albee offered to find two fishing vessels to pull the barge into a safe berth in Citizens' Dock. Church agreed, and Albee contacted Evanow, owner of the Frank & Maria, and Dunham, owner of the Paul C, who both agreed to assist in the effort.

Church agreed to pay $200 per hour for Albee's assistance, $800 per hour for the Frank & Maria, and $750 per hour for the Paul C. The parties planned for the Paul C to tow the barge into deeper waters where the Frank & Maria could come alongside and gain control of the barge. They did not discuss any time limit nor did they discuss whether the contract would be contingent on success (a so-called "no cure, no pay" contract). All during the time the parties were preparing, the storm continued to rage while the Neptune sat helplessly grounded with the barge secured alongside.

Once the vessels were in place, the Coast Guard carried a tow line from the Paul C to the barge. The Paul C then towed the barge into the deeper water of the outer harbor, which was less protected from the storm. The Frank & Maria came alongside, but the severe seas caused her to lose control of the barge. The Paul C attempted to regain control, but she was not able to do so. The barge drifted back toward the Neptune; fortunately, the crew was able to resecure the barge alongside the Neptune. The barge was then in the same position as before but now bow in instead of stern in.

After this failed effort, Albee and Church agreed that the Frank & Maria would set up a mooring arrangement. The Frank & Maria would drop anchor, pass a line to the barge, and come up on the anchor in hopes of lessening any impact between the barge and the Neptune. Once the Frank & Maria obtained the proper equipment, the Coast Guard assisted in passing a Samson line from the Frank & Maria to the barge. After assisting in the set up, the Paul C was dismissed. The Frank & Maria, with Albee aboard, remained, idling ahead to maintain a strain on the line.

The next morning, Evanow sought to increase the hourly rate for the Frank & Maria to $1,000 per hour. Church refused and later proposed a fee of $1,500 per day. Evanow did not agree, and nothing more was discussed about the fee. Evanow later asked whether he should release the barge, but Church requested that the Frank & Maria remain. Entries in the logs of both vessels

indicate that the Frank & Maria's efforts helped to keep the barge steady.

After the Frank & Maria had remained in this mooring arrangement for fifty-nine hours, another tug, the Tioga, was able to pull both the Neptune and the barge into Citizens' Dock. The Frank & Maria was then dismissed.

While in Crescent City, the Coast Guard inspected the barge. The inspection revealed some minor damage, and the Coast Guard ordered a more thorough inspection. After this second inspection, the barge was cleared to continue its voyage. Before it set sail again, a marine surveyor from the London Salvage Association also inspected the barge and approved it for the voyage.

The Neptune towed the barge to American Samoa where it off-loaded the landing craft unit. After an inspection by the crew, the Neptune and the barge set out for Hawaii. Enroute, the vessels encountered twelve foot seas. After arrival in Hawaii, the Coast Guard, the American Bureau of Shipping, Port Gardner, and KRS Marine each inspected the barge. Because of damage found to the barge, the Coast Guard revoked her certificate but gave leave for her to return to Seattle for repairs.

### B.

Plaintiffs brought this action asserting claims for pure and contract salvage. Defendants counterclaimed alleging negligence.

The magistrate judge found that the parties had entered into a salvage contract that was not contingent upon success, that the contract was not modified when the Frank & Maria set up the mooring arrangement, that the plaintiffs were not negligent in their efforts, and that the barge was damaged during the trip from American Samoa to Hawaii, not in the Crescent City Harbor. He therefore entered judgment against defendants and awarded costs to plaintiffs.

Defendants mount a multifaceted attack on nearly every aspect of the trial court's judgment. As to the contract, defendants first assert that the trial court's finding of a salvage contract is clearly erroneous. They contend that the contract was merely for towage. Furthermore, defendants argue that the contract was on a "no cure, no pay"

basis and that plaintiffs failed to complete the contract successfully because the Tioga eventually pulled both the Neptune and the barge into Citizens' dock. Lastly, defendants assert that the parties modified the contract when Church countered Evanow's demand with the $1,500 per day offer.

Defendants also contend that the trial court erred in ruling against their counterclaim. According to defendants, plaintiffs were negligent in their efforts to move the barge, and those efforts put the barge in a position where it pounded against the sandy shoal causing extensive damage to its interior structure. Moreover, defendants assert that they were prejudiced by the admission of three pieces of evidence: the parties' insurance policies, the testimony of Allen Trumbell, and a videotape of plaintiffs' efforts taken by Evanow's wife.

In addition to their attack on the judgment, defendants challenge the trial court's award of costs. They argue that the award of costs was improper in that it included: (1) expert witness fees; (2) costs for trial exhibits, photocopies, court reporter fees, and deposition transcripts that plaintiffs failed to prove were necessary; and (3) witness fees over the statutory maximum and fees for party witnesses.

Plaintiffs cross-appeal, arguing that the trial court erred by offsetting the damage award by the amount plaintiffs obtained from the cargo owners through settlement.

 We review findings of fact made by an admiralty trial court for clear error. *Resner v. Arctic Orion Fisheries*, 83 F.3d 271, 273 (9th Cir.1996). We also review for clear error a finding that a party did or did not breach a duty of care. *Vollendorff v. United States*, 951 F.2d 215, 217 (9th Cir.1991). Evidentiary rulings are reviewed for an abuse of discretion, and we will not reverse absent some prejudice. *EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997) (*Pape Lift*). We review an award of costs for an abuse of discretion but review whether the trial court had the authority to award costs de novo. *United States ex rel. Lindenthal v. General Dynamics Corp.*, 61 F.3d 1402, 1412 n. 13 (9th Cir.1995). Whether the trial court used the correct legal standard in computing dam-

ages is reviewed de novo. *Howard v. Crystal Cruises, Inc.,* 41 F.3d 527, 530 (9th Cir. 1994).

## II

We now analyze whether the trial court clearly erred in finding that the parties entered into a salvage contract, that the contract was not subsequently modified, and that the plaintiffs are entitled to payment for their services under that contract.

### A.

■ Whether a contract is one for towage or for salvage has several consequences. If the fee is not agreed to, salvage service commands a larger award. 1 Martin J. Norris, *The Law of Seamen* § 9:45 (4th ed. 1985) (*Norris*). Under a salvage contract, not only is the vessel liable for payment, but the cargo is as well. 3A Martin J. Norris, *Benedict on Admiralty* § 186 (7th ed. 1993) (*Benedict*). A salvage contract also creates a "preferred" maritime lien, which has a higher priority than the maritime lien created by a towage contract. *Compare* 46 U.S.C. § 31301(5) *with* § 31342(a). Finally, the crew of the salving vessel has additional rights under a salvage contract. *Norris* at § 9:45.

■ The character of the service rendered determines whether a contract is one for salvage. *The Camanche,* 75 U.S. (8 Wall.) 448, 477, 19 L.Ed. 397 (1869) (*Camanche*).

There is a marked and clear distinction between a towage and a salvage service. When a tug is called or taken by a sound vessel as a mere means of saving time, or from considerations of convenience, the service is classed as towage; but if the vessel is disabled, and in need of assistance, it is a salvage service.

*The Flottbek,* 118 F. 954, 960 (9th Cir.1902). The existence of a marine peril distinguishes a salvage contract from one for towage. *Id.;* *see also Benedict* at § 188. Such a peril exists "when a vessel is exposed to any actual or apprehended danger which might result in her destruction." *Faneuil Advisors, Inc. v. O/S Sea Hawk,* 50 F.3d 88, 92 (1st Cir.1995). Whether a marine peril exists is a question of

fact reviewed for clear error. *Clifford v. M/V Islander,* 751 F.2d 1, 5 (1st Cir.1984).

■ Defendants' attack on the trial court's finding of a marine peril is twofold. First, they argue that the evidence does not support the finding of marine peril prior to the plaintiffs' efforts. Second, defendants assert that the trial court improperly considered evidence of insurance and a risk of pollution when determining whether a marine peril existed.

For their first proposition, defendants rely on the testimony of their expert witness, Julian Leitz. Leitz is purportedly recognized as the most experienced salvage master on the West Coast and testified there was not "any kind of imminent peril." Defendants also cite testimony that "the tug was well ballasted onto the shoal, the barge was well secured to the tug and that the barge was at all times afloat" before plaintiffs became involved. According to defendants, "the trial court appears to have ignored [this] largely undisputed evidence."

The trial court, however, credited the conflicting testimony of plaintiffs' expert, David Grant. Grant testified that both the Neptune and the barge were in imminent peril. According to him, the pounding of the barge against the Neptune and the listing of the barge created a substantial danger that the vessels would be holed. This opinion, coupled with all the other evidence before the trial judge, demonstrates that this finding was not clearly erroneous because the trial court's "account of the evidence is plausible in light of the record viewed in its entirety." *Phoenix Eng'g and Supply Inc. v. Universal Elec. Co.,* 104 F.3d 1137, 1141 (9th Cir.1997). It appears that it is the defendants, not the trial court, who have ignored evidence.

Undaunted, defendants assert that the trial court erred as a matter of law by considering the evidence of insurance and the risk of pollution when making its finding. At oral argument, counsel for defendants asserted that the evidence of insurance had a pervasive prejudicial effect that clouded the entire trial. We therefore address this issue separately. We point out here that there was ample evidence of a marine peril without the insurance evidence.

■ Concerning the risk of pollution evidence, defendants cite *Fine v. Rockwood,* 895 F.Supp. 306 (S.D.Fla.1995), for the proposition that considering the risk of pollution was error. *Fine,* however, merely states that the risk of pollution "by itself" is not enough to create a marine peril. *Id.* at 310. Here, the Coast Guard's assessment of a risk of pollution was properly considered as a *factor* indicating that there was a marine peril, i.e., loss of the ship, which would result in a spill. *See B.V. Bureau Wijsmuller v. United States,* 702 F.2d 333, 339 (2d Cir.1983).

### B.

■ Even if a marine peril did exist, defendants argue that the Coast Guard's involvement renders the contract one for towing not salvage. According to defendants, "[o]nce the Coast Guard becomes involved in the removal of a stranded vessel, the operation becomes one of towing." For this remarkable proposition, defendants cite one case, *American Home Assurance Co. v. L & L Marine Serv., Inc.,* 875 F.2d 1351 (8th Cir.1989). However, *American Home* does not support defendants' position; the district court in that case found that there was no marine peril at the time of the salvor's actions because the Coast Guard had removed the imperiled vessels from the danger. *Id.* at 1355. This is not the case here.

### C.

Defendants also argue that the contract (however characterized) was conditioned on success. They cite cases indicating that a salvage contract is presumptively contingent upon success. According to defendants, the trial court clearly erred in finding that the contract was to pay in any event because plaintiffs failed to bear their burden to rebut the "no cure, no pay" presumption. Since another vessel ultimately towed both the Neptune and the barge into Citizens' Dock, defendants continue, plaintiffs were not successful and are not entitled to any award whatsoever.

■ In contrast to a pure salvage claim, a salvage contract may be "payable at all events" or "only in the case of success." *The Elfrida,* 172 U.S. 186, 192, 19 S.Ct. 146, 43 L.Ed. 413 (1898). The existence of a salvage contract is typically raised as a defense to a pure salvage claim in order to escape the application of the more generous pure salvage award rules. *See, e.g., Kimes v. United States,* 207 F.2d 60, 64 (2d Cir.1953). The burden in this instance is therefore on the one attempting to escape pure salvage law to prove that a contract exists. *Id.; see also Camanche,* 75 U.S. (8 Wall.) at 477. It has been held that a "no cure, no pay" contract, which would justify a high contractual fee and effect a preferred lien, is generally presumed unless the one asserting that the contract displaces a pure salvage claim proves that the contract was payable at any event. *Atco, Inc. v. Disch Constr.,* 1993 A.M.C. 2195, 2199, 1992 WL 230482 (S.D.N.Y.1992); *The Susan,* 23 F. Cas. 440, 442–43 (D.Mass.1859). Here, however, it is less than clear whether this presumption is appropriate. Nor is it clear who should bear the burden of proof on this issue. We need not address this complex question, however, because there is ample evidence for a finding that plaintiffs' efforts were in fact successful.

■ A salvage award is proper where there was "[s]uccess in whole or in part, or that the service rendered contributed to such success." *The "Sabine",* 101 U.S. 384, 384, 25 L.Ed. 982 (1879). "Success" in salvage law is "preservation of the property for the benefit of the owner." *Benedict* at § 90; *see also U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1104 (9th Cir.1985). While defendants argue that plaintiffs were not successful because another tug eventually pulled the barge and the Neptune into Citizens' Dock, the district court found that plaintiffs' efforts materially contributed to preventing damage to the barge. The Court found that the mooring arrangement "did in fact do what it was intended to do," i.e., prevent damage from slamming between the barge and the Neptune. This finding is not clearly erroneous as both the crew of the Neptune and the Neptune's logs confirmed that the Frank & Maria's efforts lessened the impact of the barge on the Neptune. Since the purpose of a salvage effort is to save the vessel and its cargo, not to bring the vessel to a certain location, we affirm the trial court on this basis.

### D.

■ Defendants' last contract-related attack focuses on the period after the barge was resecured to the Neptune and the Frank & Maria set up a mooring arrangement. Defendants contend that, at this point, the parties modified their contract and agreed to a fee of $1,500 per day. The facts on this issue are not in dispute. Evanow sought to increase the hourly rate for the Frank & Maria to $1,000. Church made a counteroffer of $1,500 per day to which Evanow did not respond. There was no further discussion of the rate. Defendants argue that because plaintiffs continued to hold the line, they assented to Church's proposal.

■ Whether plaintiffs' continued work was a manifestation of assent to this counteroffer or merely performance under the original contract is a question of fact. 17A Am. Jur.2d *Contracts* § 523 (1991). We therefore look for clear error. *See Chandler Supply Co. v. GAF Corp.,* 650 F.2d 983, 988 (9th Cir.1980). The trial court found that this was not a tacit modification, in part, because Evanow offered to cut the line loose but Church asked him to hold on. We affirm this finding as we do not have a "definite and firm conviction that a mistake has been committed." *Committee for Idaho's High Desert, Inc. v. Yost,* 92 F.3d 814, 819 (9th Cir. 1996).

### III

■ We next discuss whether the magistrate judge clearly erred in finding that the plaintiffs were not responsible on the counterclaim for their attempt to bring the barge to safety.

In analyzing this claim, both parties and the trial court used the standard articulated in *Berg v. Chevron U.S.A., Inc.,* 759 F.2d 1425, 1430 (9th Cir.1985), which held "that the proper standard of care is that a rescuer will be held liable only (1) for negligent conduct that worsens the position of the victim or (2) for reckless and wanton conduct in performing the rescue." *Berg* involved an unsuccessful life rescue. It is generally held, however, that a successful property salvor may be liable for ordinary negligence that results in distinguishable injury—i.e., damage other than that the saved vessel would

have suffered had the salvage efforts not been made. *See, e.g., The Noah's Ark v. Bentley & Felton Corp.,* 292 F.2d 437, 440 (5th Cir.1961); *The Cape Race,* 18 F.2d 79, 81 (2d Cir.1927); *The S.C. Schenk,* 158 F. 54, 60 (6th Cir.1907); *Sands v. One Unnamed 23' Seacraft, Pleasure Vessel,* 959 F.Supp. 1488, 1494 (M.D.Fla.1997); *Benedict* at § 120.

We need not decide whether *Berg* changed the standard for distinguishable injury from a successful property salvage because even if we apply the ordinary negligence standard, we would affirm because the trial court found that plaintiffs were not negligent and that they did not worsen the position of the barge. If plaintiffs are not at fault under the more strict Fifth Circuit test, they would not be liable under *Berg* either. *See Heath v. Cast,* 813 F.2d 254, 257 (9th Cir.1987) (harmless error principles embodied in Fed.R.Civ.P. 61 apply to appellate courts).

■ The finding of no negligence is not clearly erroneous. Plaintiffs' expert testified that he believed the salvage plan and its execution were reasonable. Moreover, he testified, based on a substantial factual basis, that the damage was not caused by the grounding in Crescent Bay but was incurred during the subsequent voyage from Samoa to Hawaii. The trial court credited this testimony over that of defendants' expert. We affirm the trial court's findings: "An appellate court must be especially reluctant to set aside a finding based on the trial judge's evaluation of conflicting ... expert oral testimony." *Beech Aircraft Corp. v. United States,* 51 F.3d 834, 838 (9th Cir.1995).

### IV

We now turn to defendants' challenge to the trial court's evidentiary rulings.

### A.

■ At oral argument, defendants' counsel maintained that the admission of the insurance coverage evidence was manifest error and tainted the entirety of the trial. This, he argued, was the monumental blunder that ripped apart defendants' right to fair trial.

While the trial court seems to have admitted the evidence to show state of mind (which is irrelevant), evidence of defendants' insurance would have been properly admitted to determine the value of the saved property for purposes of calculating an award under plaintiffs' pure salvage claim. *See San Francisco Bar Pilots v. The Vessel Peacock*, 733 F.2d 680, 682 (9th Cir.1984). Moreover, because this was a bench rather than a jury trial, the risk of prejudice due to evidence of insurance is far less likely. *See EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir.1994). Defendants have failed to show any prejudice; they ask us to presume it. We will not do so.

### B.

■ The defendants were not prejudiced by the trial court's admission of Trumbell's testimony. Trumbell was an employee of the Crescent City harbor office and was aboard the Paul C during part of the salvage operation. Defendants point out that Trumbell was not disclosed as a witness until just before the trial date, which, according to plaintiffs, was the earliest they could do so. Defendants argue this was prejudicial because Trumbell "provided expert opinion as to the conditions in the harbor on January 6, the normal weather conditions in the area, and as to the physical layout of Crescent City Harbor, including water depths."

At oral argument, defendants' counsel stated that he was unfairly surprised by Trumbell's testimony and that defendants did not have a fair opportunity to rebut it. He admitted, however, that defendants never asked the trial judge for a continuance, nor did they ask for any other relief beyond the objection.

Putting aside this lack of preservation of error, the record reveals that Trumbell's testimony was not "expert opinion" and was largely duplicative. This being the case, defendants were not prejudiced by this testimony. Allowing Trumbell to testify was not an abuse of discretion since we cannot say "more probably than not, the error tainted the verdict." *Kisor v. Johns–Manville Corp.*, 783 F.2d 1337, 1340 (9th Cir.1986).

### C.

■ Defendants also argue that the admission of a videotape taken by Evanow's wife was prejudicial. The original tape re-corded events out of sequence. Mrs. Evanow began taping in the middle of the videotape. When the tape ended, she rewound it and continued recording from the start of the tape. To make the recording chronologically correct, plaintiffs rearranged the sequence on new copies but failed to inform defendants that the tapes had been so edited. Defendants did not receive a copy of the tape to be used until the first day of trial. Because of this, defendants argue that they did not have time to have an expert determine whether the original tape was edited to remove the allegedly "crucial moment."

As troubling as plaintiffs' conduct is, defendants' lack of diligence in testing the copy undermines their claim. When confronted with this issue at trial, the magistrate judge admitted the tapes and told defendants that they could have the tapes examined and could renew their objection. Defendants now argue that this did not allow sufficient time for an expert examination. At the time of trial, however, they failed to seek a continuance to secure the time that they assert they so sorely needed. More importantly, to this day defendants have not had the tape examined. They thus gave up any opportunity to move for reconsideration in hopes of winning on appeal. Now, without any evidence of tampering or prejudice whatsoever, defendants ask us to reverse a judgment based on mere speculation that plaintiffs' counsel has perpetrated a fraud on both the trial court and on this court. The answer to this contention is obvious.

### V

The trial court awarded costs to plaintiffs, including expert witness fees, expenses for trial exhibits and photocopies for trial, court reporter and transcript fees, as well as witness fees.

■ The trial court did not have the power to award expert witness fees as costs. In *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), the Supreme Court held that expert witness fees are only recoverable pursuant to a contract or explicit statutory authority. *Id.* at 439, 107 S.Ct. 2494. There is no such contractual or statutory authority in this

case. Nonetheless, plaintiffs argue that there should be an exception to the *Crawford Fitting* rule for salvage cases. While the equitable principles of salvage law are to guide the trial court in determining *whether* to award costs and the amount thereof, the *power* to award costs comes from federal statutory law, not these principles. *Benedict* at § 303. The trial court therefore abused its discretion in awarding expert witness fees over the statutory maximum for witnesses.

 It did not, however, abuse its discretion as to the costs for trial exhibits, photocopies, court reporter fees, and deposition transcripts. Defendants argue that plaintiffs failed to demonstrate that these costs were "necessary" for use in the case. *See* 28 U.S.C. § 1920(4). Additionally, defendants object to the allowance of court reporter fees and costs for the transcripts of depositions. Deposition costs are taxable if they are reasonably necessary for trial. *Pape Lift*, 115 F.3d at 683. Having reviewed the record, we are satisfied that the trial court did not abuse its discretion in awarding these costs.

 The trial court's award of witness fees and expenses for parties Dunham, Albee, and Evanow as well as certain witness expenses that exceeded the statutory maximum are another matter. Dunham, Albee, and Evanow are not "witnesses" under 28 U.S.C. §§ 1821 & 1920. With minor exceptions not applicable in this case, the expenses of witnesses who are themselves parties are not taxable. *See Haroco, Inc. v. American Nat'l Bank and Trust Co.*, 38 F.3d 1429, 1442 (7th Cir.1994); 10 Charles Alan Wright et al., *Federal Practice and Procedure: Civil* § 2678 (3d ed.1998). Additionally, it is apparent from a review of the record that the award of costs for certain witnesses exceeds the statutory cap defined by 28 U.S.C. § 1831(c)(2). The trial court abused its discretion in awarding these costs.

### VI

 Plaintiffs' cross-appeal concerns the propriety of offsetting their contract award by the amount they obtained from a settlement with the cargo owners. When a salvage effort benefits both a ship and its cargo, the cargo is liable for a pro rata share of the salvage contract. *Benedict* at §§ 206, 209. Plaintiffs, however, argue that the settlement with the cargo owner involved only their pure salvage claim against the cargo owner. This is based on the belief that their contract salvage claim against the cargo owner was barred by Church's failure to obtain approval for the contract from the cargo owners. *See id.* at § 209; *see also Albers Milling Co. v. Barge Antone F*, 487 F.Supp. 37, 40 (W.D.Wash.1980). Thus, as they see it, the basis of the settlement with the cargo owner has nothing to do with the basis of their claim in this action, and defendants are entitled to no set off. This argument, however, is undermined because the question of whether the contract claim was barred as to the cargo owner was not litigated in the trial court. Nor should it have been; a settlement puts to rest contingencies. We will not require the trial courts to try those contingencies to determine how to characterize settlement funds.

Even so, we are still left with the important question of how a settlement with a co-defendant should be apportioned to decrease an award against nonsettling defendants in a salvage contract case. In *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994) (*McDermott*), the Supreme Court struggled with the proper method for calculating liability for nonsettling defendants in admiralty tort cases. After a lengthy analysis of three principal alternatives, the Court held that the liability of nonsettling defendants in such cases should be calculated with reference to the allocation of proportionate responsibility rather than giving nonsettling defendants a credit for the amount of the settlements obtained by plaintiffs. *Id.* at 217, 114 S.Ct. 1461. The Court held that this approach was more consistent with the baseline admiralty approach, announced in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), of dividing damages amongst joint tortfeasors according to the degree of fault. *McDermott*, 511 U.S. at 217, 114 S.Ct. 1461.

Here, we have a similar undercurrent in that contract salvage awards are generally apportioned between the vessel and its cargo

according to their relative values. Each is thus liable on a pro rata basis. *Stratton v. Jarvis*, 33 U.S. (8 Pet.) 4, 10–11, 8 L.Ed. 846 (1834); *Savannah Sugar Ref. Corp. v. Atlantic Towing Co.*, 15 F.2d 648, 650 (5th Cir. 1926). Therefore, one could argue that a salvage contract award should be offset by the proportion of the overall award that would have been paid by the settling party.

But, importantly, this is not a tort case. The universal non-admiralty rule is that contract damages are offset pro tanto by the amount of the settlement with a co-obligor. *See, e.g.*, 2 Samuel Williston & Walter H.E. Jaeger, *Williston on Contracts* § 341 (3d ed.1959); *Restatement (Second) of Contracts* § 294(3) & cmt. f (1979). This is simply a manifestation of the rule that a contracting party should not receive more than was bargained for. In contrast to this uniformity, the Court in *McDermott* was confronted with three alternative methods, each widely used, for allocation of liability in tort law. 511 U.S. at 208, 114 S.Ct. 1461. Because we are not faced with such a divergence of views in the world of contract law, we hold that the liability of nonsettling defendants in a contract salvage case is reduced pro tanto by the amount of settlement obtained from co-obligors.

Here, the salvors ended up with their contractual pay and the shipowner defendants do not contest that they were held liable for more than their pro rata share. We therefore affirm the award of damages.

## VII

The last issue is plaintiffs' motion for sanctions. Fed. R.App. P. 38. "An appeal is frivolous when the result is obvious or where the arguments are wholly without merit." *Cannon v. Hawaii Corp. (In re Hawaii Corp.)*, 796 F.2d 1139, 1144 (9th Cir. 1986) (citations and internal quotations omitted). Defendants' arguments against the judgment were without merit. We could, therefore, award plaintiffs reasonable attorneys' fees and double costs incurred in defending the judgment on appeal. *See Gaskell v. Weir*, 10 F.3d 626, 629 (9th Cir.1993). However, plaintiffs argued in the trial court for and received costs for which they were clearly not entitled. But for this excessive zeal, plaintiffs might have convinced us to

award Rule 38 sanctions—but not with it. However, plaintiffs are awarded their costs on appeal.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.