310 F.3d 628
 Sampson MADEJA; Jose L. Rodriguez; Michael Steven Mallars; Solvi Olafsson; Olafur Skagvik, Plaintiffs-Appellants,
v.
OLYMPIC PACKERS, LLC, in personam; M/V Fierce Packer O.N. 546488, her engines, tackle, stores, and equipment freight, In Rem, Defendants-Appellees.
 No. 01-16447.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 10, 2002.
 Filed October 31, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Jay Lawrence Friedheim, Honolulu, HI, for the plaintiffs-appellants.
 John O'Kane, Jr., Honolulu, HI, for the defendants-appellees.
 Appeal from the United States District Court for the District of Hawaii; Susan Oki Mollway, District Judge, Presiding. D.C. No. CV 00-0190 SOM.
 Before: WALLACE, TASHIMA, and TALLMAN, Circuit Judges.
 TASHIMA, Circuit Judge.
 
 
 1
 Sampson Madeja ("Madeja"), Jose Rodriguez ("Rodriguez"), Michael Steven Mallars ("Mallars"), Solvi Olafsson ("Olafsson"), and Olafur Skagvik ("Skagvik") (collectively "Appellants") appeal from the district court's final judgment in this admiralty action, entered after a bench trial, denying them relief on the majority of their claims, filed in personam against Olympic Packer, LLC ("Olympic"), and in rem against the vessel Fierce Packer, for, inter alia, unpaid wages, penalty wages, and wrongful discharge. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.
 
 I. BACKGROUND
 
 2
 Olympic, a Washington limited liability corporation, is the legal owner of the Fierce Packer, a 163-foot ship chartered to Interisland Maritime Services, Inc. ("IMAR"), on November 29, 1999. The "Bareboat Charter Agreement" required that IMAR be responsible for all operating, crew, maintenance, repair, and insurance costs during the charter period. During the IMAR charter period, Olympic played no role either in the hiring and control of the crew, or in the navigation of the ship.
 
 
 3
 While negotiating the charter agreement, Ron Ellis ("Ellis"), the president of IMAR, inquired as to the availability of a crew for the Fierce Packer. Ellis was put in touch with Skagvik, who had previously served as master of the Fierce Packer on a number of voyages operated by Olympic. Ellis hired Skagvik to be captain of the Fierce Packer on November 29, 1999, orally promising him $275 a day for his work on the ship during the IMAR charter period, and asked him to put a crew together. Skagvik never signed a written employment contract with IMAR. On the same day, Ellis hired Mallars as chief engineer, orally promising him $250 a day for his work on the ship during the IMAR charter period. Like Skagvik, Mallars never signed a written contract with IMAR for his employment, though he did initial certain parts of a document that Ellis showed him that outlined his job responsibilities, but omitted his wage and the duration of his employment.
 
 
 4
 The Fierce Packer set sail from Seattle, Washington, to Honolulu, Hawaii, on November 30, 1999. Upon arriving in Honolulu, additional crew were hired to work on the Fierce Packer. Ellis hired Rodriguez as a deckhand/cook on December 18, 1999, orally promising him $125 a day for his work on the Fierce Packer. While Rodriguez never signed an employment contract with IMAR, he initialed the same document that was initialed by Mallars. On January 11, 2000, Ellis hired Madeja to be a mate on the Fierce Packer at the rate of $200 a day. Madeja worked on the Fierce Packer for only a short time, ending his employment there on January 28, 2000.[1] Finally, on January 31, 2000, Skagvik hired his son, Olafsson, (with Ellis' approval) to work as chief mate at the rate of $200 a day. Olafsson flew from Seattle to Honolulu with the expectation that he would be reimbursed for travel expenses exceeding $500. While Olafsson knew of the IMAR charter when he agreed to work on the Fierce Packer, and considered himself IMAR's employee, he never signed a written employment contract with IMAR.
 
 
 5
 While in Hawaii under the IMAR charter, the Fierce Packer went on three trips to Christmas and Fanning Islands. The first trip was from December 21, 1999, to January 4, 2000; the second trip was from January 13 to 27, 2000; and the final trip was from February 4 to 17, 2000.
 
 
 6
 After the second trip, Skagvik and Mallars spoke with Kim Hansen ("Hansen"), the president of Kim Hansen Enterprises, Inc. ("KHE"), a subsidiary corporation of Olympic responsible for managing the Fierce Packer. They told Hansen that Ellis was behind on payments to the crew and that shippers were beginning to complain about Ellis. Hansen asked Skagvik and Mallars to investigate the possibility of conducting further cargo runs to Christmas and Fanning Islands through Hansen, rather than through IMAR. Soon after, Olafsson and Mallars spoke with Leif Anderson ("Anderson"), the vice-president of IMAR, about the possibility of continuing cargo operations under Hansen's management. Anderson supported this proposal and, on February 17, 2000, transmitted a letter to Hansen asking that Olympic take over management of the Fierce Packer.
 
 
 7
 When the Fierce Packer returned to Honolulu on February 17, 2000, Mallars, Olafsson, Rodriguez, and Skagvik learned that IMAR was in bankruptcy and that they had been fired for (allegedly) consuming alcohol while on the Fierce Packer. That same day, Skagvik called Hansen to inform him of IMAR's bankruptcy and the crew's termination. Hansen asked Skagvik to stay on the Fierce Packer, keep it operational, and wait for Paul Schultz ("Schultz"), a KHE employee and the Fierce Packer's vessel operations manager, who would be traveling to Hawaii from Korea. According to Skagvik, Olafsson, and Mallars, Hansen asked that the rest of the crew stay on the Fierce Packer to await Schultz's arrival. Skagvik, Mallars, and Olafsson complied with this request; Rodriguez terminated his employment on the Fierce Packer on February 17, 2000. While Skagvik maintained that Hansen promised the crew payment for its work on the vessel after February 17, 2000, Hansen denied making any commitments to Skagvik on behalf of KHE or Olympic.[2] On February 21, 2000, Schultz arrived in Honolulu. While Appellants asserted that Schultz orally promised to pay them for work performed after being fired by IMAR on February 17, 2000, Schultz denied having made any commitments to the crew in that regard.[3]
 
 
 8
 After Schultz arrived, Skagvik, Mallars, and Olafsson worked under his direction. They maintained the Fierce Packer's systems and generators, kept the ship clean, made necessary repairs, informally kept "watch" on the ship, and moved the vessel three times to accommodate other cargo ships. Additionally, Schultz, Skagvik, Mallars, and Olafsson further investigated the possibility of an additional cargo trip to Christmas and Fanning Islands under Hansen's management. While neither Schultz nor Hansen committed the Fierce Packer to another cargo voyage, Skagvik, Mallars, and Olafsson created a flier to advertise the runs, faxed copies of the flier to potential customers, talked with customers by cellular phone about the possibility of cargo transport,[4] and received some cargo from customers to ship to Christmas and Fanning Islands.[5]
 
 
 9
 At some point after February 21, 2000, Schultz received a check for $8,000 owed to IMAR for cargo transported during the IMAR charter period. The check was written to "cash" and Olafsson cashed the check for Schultz because Schultz did not have the requisite two pieces of identification. From this sum, Schultz paid $1,000 each to Skagvik, Mallars, and Olafsson, and $500 to Rodriguez.[6] And at some point between February 21 and March 5, 2000, Schultz asked the crew if they would be willing to work for half their usual wage. Skagvik and Mallars refused this offer and left Honolulu on March 5, 2000.[7] According to Schultz, only Olafsson agreed to the arrangement. However, while Olafsson remained on the Fierce Packer until March 17, 2000, he denied having agreed to a reduced rate of pay.[8]
 
 
 10
 Skagvik and Mallars were not paid for work done between February 18 and March 5, 2000. Olafsson was not paid for work done between February 18 and March 17, 2000. Beginning February 17, 2000, Appellants repeatedly made demands on Olympic, through KHE, for their unpaid wages. Shortly thereafter, Appellants commenced this action and had the Fierce Packer arrested as security for their wage claims. Olafsson remained on the vessel nearly 24 hours a day, taking care of the Fierce Packer while it was in custody. To secure the Fierce Packer's release, Olympic paid Appellants' wage claims, as demanded in the affidavits attached to their Verified Complaint, and posted a $135,000 bond.[9]
 
 
 11
 The litigation over who owed the wages and in what amounts proceeded and, shortly before trial, Appellants attempted to obtain a statement and documents from Anne Stevens ("Stevens"), an agent of Olympic. Appellees moved to exclude this evidence at trial and the court granted this motion, finding that Appellants' request was untimely.
 
 
 12
 After trial, the district court found that the Fierce Packer was liable in rem for wages due under the IMAR charter, but that the vessel was discharged of this liability when Olympic paid Appellants' wages to get the Fierce Packer released from custody. The court also found that Olympic was liable in personam for wages due Appellants in the post-IMAR charter period and awarded compensatory damages and pre-judgment interest from the date the wages were due. The court, however, denied Appellants' penalty wage claim under 46 U.S.C. § 10313, finding that there was no discrete, specific, or imminent voyage planned for the Fierce Packer during the post-IMAR charter period. Additionally, the district court rejected Appellants' wrongful termination claims and request for attorney's fees.
 
 II. STANDARD OF REVIEW
 
 13
 The judgment of the district court, sitting in admiralty without a jury, is reviewed for clear error. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Simeonoff v. Hiner, 249 F.3d 883, 888 (9th Cir.2001). Findings of fact made in admiralty are reviewed for clear error. Evanow v. M/V Neptune, 163 F.3d 1108, 1113 (9th Cir.1998). An admiralty court's conclusions of law are reviewed de novo. Fireman's Fund Ins. Cos. v. Big Blue Fisheries, Inc., 143 F.3d 1172, 1175 (9th Cir.1998). Evidentiary rulings by an admiralty court are reviewed for an abuse of discretion. Evanow, 163 F.3d at 1113. A district court's order denying a Rule 15(b) motion to conform the pleadings to the evidence is reviewed for an abuse of discretion. Martinez v. Newport Beach City, 125 F.3d 777, 785 (9th Cir.1997), rev'd on other grounds, Green v. City of Tucson, 255 F.3d 1086, 1093 (9th Cir.2001) (en banc); Campbell v. Bd. of Trs. of Leland Stanford Jr. Univ., 817 F.2d 499, 506 (9th Cir.1987). An admiralty court's decision to award attorney's fees and costs is reviewed for an abuse of discretion. B.P. N. Am. Trading, Inc. v. Vessel Panamax Nova, 784 F.2d 975, 976-77 (9th Cir.1986).
 
 III. DISCUSSION
 A. Attorney's Fees
 
 14
 Initially, we reject Appellants' request in the district court for attorney's fees. The equitable grant of attorney's fees is appropriate in admiralty only when the shipowner acted arbitrarily, recalcitrantly, or unreasonably. Vaughan v. Atkinson, 369 U.S. 527, 531-32, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Kopczynski v. The Jacqueline, 742 F.2d 555, 559 (9th Cir. 1984). Appellants assert that Olympic acted with bad faith both before[10] and during[11] the litigation, and that the district court therefore erred when it refused to award them attorney's fees.
 
 
 15
 These allegations of bad faith fail because there is no evidence that Olympic was intentionally dishonest or recalcitrant either in refusing to pay Appellants' wage claims or in defending against these claims. The district court reasonably concluded that Olympic justifiably expected the crew to seek payment from IMAR for work performed during the IMAR charter period,[12] and that Hansen and Schultz were credible witnesses when testifying that they never promised to compensate the crew for post-IMAR work on the Fierce Packer. These finding of good faith are not clearly erroneous; as such, they are entitled to deference. See Exxon Co. v. Sofec, Inc., 54 F.3d 570, 576 (9th Cir.1995) ("Special deference is paid to a trial court's credibility findings."), aff'd, 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996).[13] Finally, there is no evidence that Olympic was intentionally dishonest or recalcitrant during the course of litigation. The district court clearly has discretion to award punitive attorney's fees when shipowners, for example, frustrate seamen's claims by willfully disregarding court orders, Noritake Co. v. M/V Hellenic Champion, 627 F.2d 724, 730 n. 5 (5th Cir.1980), or by frivolously delaying litigation, H & A Trading Co. v. Margo Farms Caribe, Inc., 1992 WL 319688, at *7 (D.P.R.1992). There simply is no evidence in the record, however, to substantiate Appellants' claim that the district court abused its discretion by not finding Olympic guilty of such obstruction.
 
 B. Rule 15(b) Amendment
 
 16
 Additionally, the district court correctly denied Appellants' motion under Federal Rule of Civil Procedure 15(b) to conform their complaint to the evidence. While leave to amend should be granted freely until the defendant files a responsive pleading, after such point, leave to amend "should be granted unless amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay." Yakama Indian Nation v. Wash. Dep't of Revenue, 176 F.3d 1241, 1246 (9th Cir.1999) (citation and internal quotation marks omitted), cert. denied, 528 U.S. 1116, 120 S.Ct. 935, 145 L.Ed.2d 813 (2000). With regard to the penalty wage claims (except those against Olympic for wrongful termination), the district court clearly considered these claims on the merits, making Appellants' Rule 15(b) motion irrelevant. With regard to Appellants' wrongful termination claim, while the district court did exclude consideration of this claim against Olympic, it denied the motion because Olympic did not have sufficient notice. Because "Rule 15(b) does not permit amendments to include issues which are only inferentially suggested by incidental evidence in the record," Campbell, 817 F.2d at 506, and because the record supports the district court's finding that Olympic would have been prejudiced by lack of notice, we conclude that the district court did not abuse its discretion in denying Appellants' Rule 15(b) motion.
 
 
 17
 The district court also correctly rejected Appellants' Rule 15(b) motion to cure, for purposes of their in rem action, a failure to verify the amount of post-IMAR wages due. Appellants never explain how a motion to conform could have cured their non-verified complaint. Given the complaint's complete absence of post-IMAR wage verification, merely "conforming" the complaint would not have cured the verification deficiency.[14] Thus, the district court did not abuse its discretion in denying the motion to conform the complaint to the evidence.
 
 C. Verification of Post IMAR Wages
 
 18
 Admiralty Supplemental Rule C(2)(a) of the Federal Rules of Civil Procedure provides that when a party pursues an in rem action to enforce a maritime lien, the complaint for such an action must be verified. United States v. Argent Chem. Labs., Inc., 93 F.3d 572, 574 (9th Cir.1996) ("Under the Supplemental Rules for Certain Admiralty and Maritime Claims ..., an in rem action begins with a complaint that must `be verified on oath or solemn affirmation' and that must `describe with reasonable particularity the property that is the subject of the action.'") (quoting Supplemental Rule C(2)).
 
 
 19
 Although Appellants' affidavits were attached to their complaint, these affidavits only pertained to wages due as of February 17, 2000; they were completely silent with regard to wages due Appellants for the post-IMAR period. Appellants never filed supplemental affidavits to verify the complaint's allegations of wages due for the post-IMAR period.[15] The district court correctly concluded that because Appellants' claims for wages owed during the post-IMAR charter period were not verified, "no lien attached to the Fierce Packer, in rem."
 
 
 20
 Appellants contend that their claims should be considered in light of the trial testimony for the purpose of verification. But they have cited no case which holds that an unverified complaint can be cured by trial testimony.[16] To the contrary, controlling precedent dictates that Appellants' failure to verify their complaint deprived the district court of in rem jurisdiction. United States v. $84,740.00 U.S. Currency, 900 F.2d 1402, 1405 (9th Cir.1990), rev'd on other grounds, Republic Nat'l Bank v. United States, 506 U.S. 80, 89, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992); see also Pizani v. M/V Cotton Blossom, 669 F.2d 1084, 1090 (5th Cir.1982) ("Supplemental Rule C(2) of the Federal Rules of Civil Procedure... requires the filing of a verified complaint as a prerequisite to obtaining in rem jurisdiction."); Amstar Corp. v. M/V Alexandros T., 431 F.Supp. 328, 334 (D.Md.1977) ("Both Supplemental Rule B(1) and Supplemental Rule C(2) require that an action of this sort be instituted by means of a verified complaint."), aff'd, 664 F.2d 904 (4th Cir.1981). Given that the complaint failed entirely to verify the post-IMAR wage claims, the district court lacked in rem jurisdiction over those claims. Accordingly, the district court correctly held that no lien for Appellants' wage claims could attach to the Fierce Packer in rem for post-IMAR period wage claims.
 
 D. Other Wage and Penalty Claims
 
 21
 Olympic also is not liable in personam either for pre-February 17, 2000, wages due Appellants, or for wrongful termination penalty wages under 46 U.S.C. § 10313(c).[17] Appellants contend that the district court erred in finding that Olympic had sufficient cause to withhold payment of IMAR-period wages, thereby erroneously exonerating Olympic from in personam liability for IMAR-period penalty wages. Appellants contend that Olympic, as the Fierce Packer's owner, had no cause to deny its liability for these wages on account of the lien against the vessel for unpaid IMAR charter period wages. This contention, however, ignores that a valid "bareboat" charter agreement existed between Olympic and IMAR through February 17, 2000. Under this charter, IMAR became the Fierce Packer's de facto owner and, as such, only IMAR is liable in personam for these seamen's wage claims. See Everett v. United States, 284 F. 203, 205 (9th Cir.1922). Ownership of the Fierce Packer reverted back to Olympic after IMAR's bankruptcy, but, given IMAR's "ownership" of the Fierce Packer during its charter period, it was reasonable for Olympic to conclude that it was not liable in personam for IMAR's wrongful discharge of Appellants and that IMAR was ultimately responsible for the crew's pre-February 17, 2000, wage claims. While the crew could (and did) pursue their in rem claims against the Fierce Packer, which ultimately required Olympic to pay the crew's IMAR-period wages to get its vessel released from arrest, Olympic justifiably denied in personam liability. See Mateo v. M/S KISO, 41 F.3d 1283, 1289 (9th Cir.1994) (explaining that the phrase "without sufficient cause" in § 10313(g) means "arbitrary, unwarranted, unjust, and unreasonable conduct").
 
 
 22
 Further, the Fierce Packer is not liable in rem for statutory penalty wages stemming from the late payment of IMAR-period wages. 46 U.S.C. § 10313(g) imposes liability only on the vessel's "master or owner."[18] While courts have permitted in rem maritime liens against vessels to satisfy penalty wage debts, see Governor & Co. of the Bank of Scotland v. Sabay, 211 F.3d 261, 271 (5th Cir.2000), such in rem liens must stem from wage payment delays exacted by the vessel's "owner or master." See id. at 272. Given that Olympic was not the Fierce Packer's "owner" during the IMAR charter period, the Fierce Packer is not liable in rem for penalty wages which accrued during the IMAR charter period.
 
 
 23
 Olympic also is not liable for statutory wage penalties stemming from the post-IMAR charter period. 46 U.S.C. § 10313(f) provides statutory wage penalties when seamen are not promptly paid "[a]t the end of a voyage."[19] There was, however, no discrete, specific, or imminent voyage planned in the post-IMAR charter period. While post-IMAR voyages to Christmas Island, Fanning Island, or Seattle were considered, such voyages were mere possibilities discussed among Hansen, Schultz, and the crew, nothing more. We have previously held that the "voyage" requirement of § 10313(f) should be given meaning. Su v. M/V. Southern Aster, 978 F.2d 462, 469-70 (9th Cir.1992). The complete absence of a post-IMAR voyage by the Fierce Packer (or definitive plans for such a voyage) renders Appellants ineligible to recover statutory wage penalties under § 10313(f).
 
 
 24
 Further, Skagvik is statutorily ineligible for penalty wages under 46 U.S.C. § 10313. Masters typically are not eligible for § 10313's penalty wage remedies. George v. Kramo Ltd., 796 F.Supp. 1541, 1548 (E.D.La.1992). While courts occasionally have held that masters are eligible for relief under § 10313, such eligibility has been found only when the "master" in fact performs the tasks of a regular seaman. See Barber v. M/V Blue Cat, 372 F.2d 626, 628 (5th Cir.1967). The record here does not support such a finding. According to Skagvik, he stopped performing master's work once Schultz arrived in Hawaii. However, while Skagvik did perform many of the same tasks performed by the crew in the post IMAR charter period, such a functional overlap does not necessarily relieve Skagvik of his status as ship master. See Kennerson v. Jane R., Inc., 274 F.Supp. 28, 30 (S.D.Tex.1967). This is not a case where the master has formally relinquished authority, or where the master in fact never truly possessed authority as the vessel's captain. Skagvik was the Fierce Packer's master during the entire IMAR charter period, navigating the ship from Seattle to Honolulu, and from Honolulu to neighboring islands. There also is evidence that Skagvik continued to receive a master's salary throughout the post-IMAR period. Thus, the district court did not clearly err in finding Skagvik statutorily ineligible for penalty wage relief under § 10313.
 
 E. Evidentiary Rulings
 
 25
 The district court did not abuse its discretion in excluding the affidavit of Stevens, Olympic's Honolulu-based vessel manager, filed by Appellants shortly before commencement of the bench trial. While Appellants argue that Stevens is a crucial witness and that Olympic was aware that she might be called as a witness, Appellants had the opportunity to acquire Stevens' testimony long before the start of trial. It was not an abuse of discretion for the district court to exclude such evidence offered for the first time just two days before the commencement of trial.
 
 
 26
 Finally, the district court did not abuse its discretion in refusing to take judicial notice of IMAR's bankruptcy proceedings. While Appellants assert that judicial notice would have revealed important information about Olympic and IMAR, at no point do they address the district court's concern that the documents were not authenticated. Given that the documents submitted by Appellants for judicial notice were in fact not authenticated, the district court did not abuse its discretion in refusing to take judicial notice of IMAR's bankruptcy proceedings.
 
 
 27
 For the foregoing reasons, the judgment of the district court is
 
 
 28
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 Given Madeja's agreed-upon rate of $200 per day, he was owed $3,600 upon his departure from theFierce Packer. On January 27, 2000, he was given a draw of $1,500, and was still owed $2,100 in back wages.
 
 
 [2]
 The district court found that this difference in the parties' factual accounts was attributable to confusion surrounding IMAR's bankruptcy and that there was no evidence of any deliberate dishonesty. Ultimately, however, the district court found Skagvik's version of events more convincing because (1) Hansen admitted telling Skagvik to wait on the ship for Schultz's arrival, (2) Hansen could not have expected the crew to wait on the ship without compensation, and (3) a crew was needed on the ship to keep it protected and maintained and to continue exploring the possibility of further cargo voyages under Hansen's operation
 
 
 [3]
 Because Schultz testified only through depositions, the district court had only a limited basis upon which to assess his credibility. The court did, however, observe that while Olympic never had the crew sign any written contracts for their work on theFierce Packer, Schultz clearly saw the crew working on the ship after they had been fired by IMAR.
 
 
 [4]
 Skagvik alleges that Schultz promised to pay for cellular phone charges incurred while doing business for Olympic. The district court found that Skagvik should be reimbursed for long-distance calls made to the KHE Seattle office and for local calls while in Honolulu. Olafsson also rented a car when he arrived in Honolulu on February 17, 2000. While he apparently did so without first obtaining Olympic's permission, Schultz asked Olafsson, on February 21, to keep the car in his name, promising him that Olympic would reimburse the expense. Olafsson never received this reimbursement
 
 
 [5]
 While theFierce Packer ultimately did conduct another cargo run between Honolulu and Christmas Island sometime before returning to Seattle, this occurred after Appellants had terminated their employment with Olympic. The district court found that there was insufficient evidence to determine whether the cargo shipped in this final run was obtained by Schultz alone, or whether it was (in part) obtained by Skagvik, Mallars, and Olafsson.
 
 
 [6]
 While the district court acknowledged that it was not clear whether this money was offered as payment for wages they were owed for work performed before or after being fired by IMAR, the court found that the payment was for work done during the IMAR charter period
 
 
 [7]
 Schultz purchased round-trip tickets to Seattle for Skagvik and Mallars, with a return date to Honolulu of March 12, 2000. When Skagvik returned to Seattle, he was told by Olympic that he had to fire his lawyer if he wished to continue working on theFierce Packer; Skagvik did not comply with this demand and thus he did not return to Honolulu. When Mallars returned to Seattle, he was contacted by Schultz who informed him that the voyage to Christmas and Fanning Islands was not going to happen and that he need "not ... bother" returning to Honolulu.
 
 
 [8]
 Because the district court previously found that Olympic had hired Olafsson after the IMAR bankruptcy, and because there was no evidence that Olafsson agreed to reduced pay, the district court accepted Olafsson's testimony that he rejected Schultz's request to work at half pay
 
 
 [9]
 Upon release of theFierce Packer, Olafsson's employment was terminated by mutual agreement. Olafsson purchased a plane ticket back to Seattle, but was promised that if the vessel made another cargo voyage to Christmas or Fanning Island, he could come back to work on the vessel. There is no evidence that Schultz promised to reimburse Olafsson for his plane ticket, despite having paid the airfare expenses of Skagvik and Mallars.
 
 
 [10]
 Appellants point to the following pre-trial behavior as evidence of Olympic's "bad faith": "defrauding bankruptcy creditors" by cashing the $8,000 check owed to IMAR; refusing to pay the crew for their IMAR-period work "where it was clear that the vessel,in rem, owed the IMAR wages"; refusing to pay the crew for their post-IMAR work on the Fierce Packer; and refusing to reimburse the crew for work-related rental car and cellular phone expenses.
 
 
 [11]
 Appellants point to the following conduct as evidence of Olympic's "bad faith" during litigation: Hansen's testimony claiming that he never hired the crew after they were fired by IMAR; defense counsel's seeking to exclude Stevens as a witness and claiming that he represented her as an agent of Olympic; an alleged "discrepancy" between Schultz's affidavit and his deposition testimony; "threats by Olympic" in telling the crew to fire their attorney; and Olympic's representation that neither Hansen nor Schultz was its agent or employee
 
 
 [12]
 This expectation was reasonable even with the knowledge that IMAR was in bankruptcy and even with the understanding that the crew might be able to seek compensation from theFierce Packer in rem. Given that Olympic played no role in the hiring or management of the crew during the IMAR charter period, Olympic rightly expected the crew to pursue their pre-February 17, 2000, wage claims first with IMAR, and only then against the Fierce Packer in rem. The fact that Olympic ended up paying those wages to get the Fierce Packer released does not imply that Olympic acted unreasonably by not originally paying the crew their IMAR-period wages.
 
 
 [13]
 The cases on which Appellants rely (mostly from the maintenance and cure context) in which attorney's fees were awarded are easily distinguishable. In all of these cases, the court found ample evidence of callous shipowner delay and recalcitranceSee Rodriguez Alvarez v. Bahama Cruise Line, Inc., 898 F.2d 312 (2d Cir.1990); Hines v. J.A. LaPorte, Inc., 820 F.2d 1187 (11th Cir.1987); Jose v. M/V Fir Grove, 801 F.Supp. 358, 377 (D.Or.1992). Here, the district court found no such evidence and, having reviewed the record, we conclude that the district court did not abuse its discretion in this regard.
 
 
 [14]
 Appellants admitted this deficiency in the district court:
 THE COURT: [A]nd, certainly, even if you were to amend the complaint, you can't amend the affidavits that verify the complaint; so —
 MR. FRIEDHEIM: I acknowledge that, Your Honor.
 
 
 [15]
 While Appellants sought to amend their complaint via Rule 15(b) near the end of their case, as explained above, this was insufficient to cure the complaint's lack of verification vis-a-vis itsin rem lien for wages due for the post-IMAR period.
 
 
 [16]
 Appellants citeCrysen Shipping Co. v. Bona Shipping Co., 553 F.Supp. 139 (M.D.Fla. 1982), for the proposition that substantial compliance with the Supplemental Rules prevents any deficiency in the verification from defeating their claim. Even if this were controlling Ninth Circuit law, however, there is no evidence that Appellants substantially complied with the verification requirement vis-a-vis their post-IMAR claims.
 
 
 [17]
 This statute provides:
 When a seaman who has signed an agreement is discharged improperly before the beginning of the voyage or before one month's wages are earned, without the seaman's consent and without the seaman's fault justifying discharge, the seaman is entitled to receive from the master or owner, in addition to wages earned, one month's wages as compensation.
 46 U.S.C. § 10313(c).
 
 
 [18]
 This statute provides:
 When payment is not made as provided under subsection (f) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.
 46 U.S.C. § 10313(g).
 
 
 [19]
 This statute provides:
 At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier. When a seaman is discharged and final payment of wages is delayed for the period permitted by this subsection, the seaman is entitled at the time of discharge to one-third of the wages due the seaman.
 46 U.S.C. § 10313(f).