Terry J. WILLIAMS, Plaintiff–Appellant–Cross–Appellee,

v.

WILMINGTON TRUST COMPANY, Defendant–Appellee–Cross–Appellant,

American Ship Management LLC, APL Limited, Jim Londagan, Capt., Neptune Orient Lines, Ltd. and M/V APL Korea, her engines, boilers, generators, tackle, equipment, apparel, appurtenances, etc. in rem Defendant–Appellees.[1]

Docket Nos. 02–9452(L), 02–9455(XAP).

United States Court of Appeals, Second Circuit.

Argued: Aug. 25, 2003.

Decided: Sept. 25, 2003.

---

**1.** Notwithstanding the notation of the official caption, the listed defendants were not named in the notice of appeal, and did not appear before this court.

Joseph J. Perrone (John K. Fulweiler, on the brief), De Orchis & Partners, LLP, New York, NY, on behalf of Plaintiff–Appellant–Cross–Appellee Terry J. Williams.

John D. Kimball (Alan M. Weigel, on the brief), Healy & Bailie, LLP, New York, New York, on behalf of Defendant–Appellee–Cross–Appellant Wilmington Trust Company.

Before: CALABRESI and KATZMANN, Circuit Judges, and POLLACK, District Judge.*

KATZMANN, Circuit Judge.

■ It is the longstanding judgment of Congress that a sailor, once discharged from his vessel, must upon demand immediately be paid by the ship's "owner," absent some "substantial cause" for any delay in payment. 46 U.S.C. §§ 10313, 10504 (2000). If such prompt payment is not made, the owner faces a statutory penalty of two days' wages for each day it delays. *Id.* The plaintiff, Terry J. Williams, alleges that he demanded and did not receive timely payment for his work aboard the vessel M/V APL Korea ("the Korea"), and that the defendant, Wilmington Trust Company ("Wilmington"), as the putative owner of the Korea, is liable for the wage penalty. In proceedings below, Wilmington argued unsuccessfully that it was not the "owner" of the Korea for purposes of the statute, because it had chartered the vessel to another entity. Wilmington also asserted that the failure to pay promptly was the result of careless errors, which in its view suffices to demonstrate substantial cause for the belated payments. The District Court accepted this latter argument. We now affirm on the alternative ground that Wilmington is not, in fact, the Korea's owner for purposes of the wage statutes.

## Background

Terry Williams was the second mate aboard the Korea during a 2001 voyage from San Pedro, California to Asia and back again. The Korea left San Pedro on May 3 of 2001 and returned to Seattle on June 8. In Seattle, Williams received a check for his work from May 3 to June 8, totaling about $6,000. Williams remained aboard the Korea as it continued on to San Pedro, where he debarked on June 13, 2001. At that time Williams received a "voucher," basically a non-negotiable piece of paper stating that his employer owed him a week's wages.

There is some dispute in the record as to why Williams was not paid for his last week of work. Both sides agree that Williams asked before arriving in San Pedro to be paid in cash, as he was planning to travel across country with his wife. The defendant claims that Williams was offered about 60% of his wages in cash, but that he refused. Williams denies that the defendants ever offered to pay him anything.

Williams also had a disagreement with the captain of the Korea, James Londagin, over his overtime hours. Williams had claimed that he was entitled to eight hours of overtime, but the Captain did not want to authorize any of them. Williams submitted his dispute to a union official in California, who filed a grievance on his behalf with the ship's management company, American Ship Management. Ultimately, the union official negotiated a settlement for half of the disputed hours. Williams received a check for the disputed overtime, amounting to about $150, promptly after the dispute was resolved.

However, Williams' outstanding base wages, totaling $1,525, were not paid until approximately July 18, 2001, some 38 days after his voyage ended. Again, there is a dispute as to the cause of the delay.

---

* The Honorable Milton I. Pollack, of the United States District Court for the Southern District of New York, sitting by designation.

Williams alleges that the Korea's captain deliberately failed to make the necessary entries in the ship's computer, in order to punish Williams for disputing the management company's policy of paying some of its sailors with worthless vouchers. The defendant asserts that Captain Londagin failed to make the entry out of an oversight, and that a subsequent, unrelated clerical error in which a data entry clerk failed to notice the Captain's updated entry caused an additional delay.

Although the parties disagree over who is the legal "owner" of the Korea, neither disputes that the Korea was only nominally held in trust by Wilmington. Wilmington simply held title to the ship in order to qualify it for certain subsidies available solely to U.S.-flagged vessels. Wilmington then leased the Korea to American Ship Management ("ASM"), which exercised at least some degree of control over the ship and managed its daily operations. ASM at times also leased the ship on a voyage-by-voyage basis back to the foreign beneficiaries of Wilmington Trust.

When Williams returned from another foray and discovered that his check had been more than a month late, he filed suit, in the United States District Court for the Southern District of New York (Martin, J.), alleging that under the seaman's wage statutes, 46 U.S.C. §§ 10313, 10504 (2000), he was entitled to statutory damages of two days' wages for every day after the fourth day following the end of the voyage his payment was delayed, which in this case would be about $27,800. The defendants moved to dismiss, with defendant ASM arguing that the court lacked personal jurisdiction, and defendant Wilmington arguing that it is not an "owner" under the statute. The magistrate judge granted ASM's motion, but denied Wilmington's. Wilmington then moved for summary judgment, reasserting its ownership claim, and arguing that its clerical errors fell within a statutory safe harbor for late payments having "substantial cause." The District Court agreed with the latter point, and granted Wilmington's motion. *See* *Williams v. Wilmington Trust Co.,* 2002 WL 31453792 (S.D.N.Y. Oct.31, 2002).

Williams now appeals the district court's decision, and Wilmington cross-appeals the earlier adverse decision by the magistrate judge.

## Discussion

The seaman's wage statute provides that:

(b) ... The master shall pay a seaman the balance of wages due the seaman within 2 days after the termination of the agreement required by section 10502 of this title or when the seaman is discharged, whichever is earlier.

(c) When payment is not made as provided under subsection (b) of this section without sufficient cause, the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed.

46 U.S.C. § 10504. These provisions apply to "coastwise," or domestic voyages, such as the journey of the Korea from Seattle to San Pedro. An essentially identical provision applies to international voyages. 46 U.S.C. § 10313.[2]

2. It is not clear from the record whether some part of the week's wages Williams alleges to have been paid belatedly were for the Asia-to–Seattle leg of the trip, such that they would be governed by the international voyage, rather than the domestic voyage, provisions. In any event, the question is irrelevant for our purposes. The only distinction of note between the two sections appears to be that in an international voyage the owner faces no penalty for the first four days in which wages are unpaid, whereas in a domestic voyage penalties begin to accumulate immediately. That difference goes only to the extent of

■ Wilmington argues that it was at most merely negligent in failing to pay Williams his wages, and that such negligence can constitute "sufficient cause" to excuse Wilmington from paying the .wage penalty. It is clear that where the employer deliberately relies on a reasonable, but ultimately wrong, legal argument to withhold payment, it is not subject to the wage penalty. *See Pacific Mail S.S. Co. v. Schmidt,* 241 U.S. 245, 250, 36 S.Ct. 581, 60 L.Ed. 982 (1916) (finding penalty inapplicable where employer "had strong and reasonable ground for believing the statute ought not to be held to apply"); *Chretien v. Exxon Co., U.S.A.,* 863 F.2d 182, 184 (1st Cir.1988); *Conte v. Flota Mercante Del Estado,* 277 F.2d 664, 672–73 (2d Cir. 1960) (holding that "bona fide dispute" as to whether wages were due negates penalty).

■ The Supreme Court has argued persuasively that negligent failures to pay are not comparable to this intentional, good-faith refusal to tender wages. As the Court has twice observed, the purpose of the statute, as evinced both by its language and its legislative history, is "to secure the promptest possible payment of wages." *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 573, 102 S.Ct. 3245, 73

L.Ed.2d 973 (quoting H.R.Rep. No. 1657, at 2, 3 (1898)); *see Collie v. Fergusson,* 281 U.S. 52, 55, 50 S.Ct. 189, 74 L.Ed. 696 (1930). The Court concluded from that premise—reasonably, we think—that the statute is "designed to deter negligent or arbitrary delays in payment." *Griffin,* 458 U.S. at 572, 102 S.Ct. 3245.[3]

Wilmington, however, asserts that we are bound by our post-*Griffin* holding in *Vinieris v. Byzantine Maritime Corp.,* 731 F.2d 1061, 1063–64 (2d Cir.1984), which Wilmington believes is to the contrary. It is true that we said in *Vinieris* that "[b]efore [the plaintiff] could recover under this section ... there had to be a showing of 'conscious misconduct' on the part of the ship's Captain, conduct by the Captain which was arbitrary, unwarranted, unreasonable, unjust, *and* willful." *Id.* at 1064 (emphasis added; internal citations omitted). There is little indication, however, that the *Vinieris* court intended to address anything other than deliberate refusals to pay. Indeed, the plaintiffs there had never offered a negligence theory; they asserted that "the owners ... deliberately withheld this money." *Id.* at 1062. Thus, we had no reason to decide whether sufficient cause could be established by negligence.[4]

Williams' damages, if any, an issue not before us.

3. We believe that, contrary to Wilmington's assertion, there is a strong argument that these comments in *Griffin* were not *dicta*. *Griffin* concerned a challenge to a decision of the Fifth Circuit, in which the Fifth Circuit had decided that it had the authority to set limits on the amount of penalties under the statute. 458 U.S. at 568, 102 S.Ct. 3245. Although this position was inconsistent with the plain, unlimited language of the statute, the respondents argued that the unlimited reading of the statute, under which they were liable for more than $300,000 in damages for late payment of $412.50 in wages, was both absurd and irreconcilable with the "compen-

satory" purpose of the statute. *Id.* at 571, 102 S.Ct. 3245. Thus, the Court's analysis of the statute's purpose, including its conclusion that the damages provision was not purely compensatory but rather intended to "deter negligent or arbitrary delays," was arguably necessary to rebut the respondent's position.

4. We are similarly unpersuaded by Wilmington's reliance on *Livanos v. Pateras,* 192 F.2d 319 (4th Cir.1951). In that case, the court of appeals upheld a district court's decision, after a bench trial, that there was sufficient cause for the defendant's failure to pay. The district court had found that the failure was based on "inadvertent clerical mistakes," and the Fourth Circuit agreed that the "these ... findings find ample support in the evidence."

■ Ultimately, however, this is a knot we need not untie. As the plain text of the statute evidences, if Wilmington is not "the master or owner," it cannot be liable for a wage penalty. *Madeja v. Olympic Packers, LLC,* 310 F.3d 628, 638 (9th Cir.2002); *Caldwell v. Solus Ocean Sys.,* 734 F.2d 1121, 1123 & n. 3 (5th Cir.1984). Wilmington attempts to remove the burden of ownership by arguing that its arrangement with ASM, known in nautical circles as a "bareboat charter," made ASM what we have sometimes termed the "owner *pro hac vice* " ("for this cause"), so that under the literal language of the statute it is ASM, not Wilmington, that would be liable for any penalty. The magistrate judge dismissed this argument, reasoning that even if there are other potential "owner[s]" under the statute, Wilmington still falls within the plain meaning of that term. *Cf.* 1 U.S.C. § 1 (2000) ("In determining the meaning of any Act of Congress, unless the context indicates otherwise ... words importing the singular include and apply to several persons, parties, or things.").

We have previously determined, however, that the term "owner" has a special meaning as it used in the admiralty law. In *The John E. Berwind,* 56 F.2d 13 (2d Cir.1932), the crew of a tugboat had filed a claim against the nominal owner of the vessel seeking unpaid wages. *Id.* at 13. In resolving their claim, we noted first that the owner had "given complete control of the vessel" over to another individual. *Id.* at 15. We then concluded that the lessee, as the "owner *pro hac vice* " of the tug,

was "the only one personally liable for" the unpaid wages. *Id.*

■ Congress' re-enactment of the wage statutes in 1983, *see* Partial Revision of 46 U.S.C., "Shipping," Pub.L. No. 98–89 § 10, 97 Stat. 500 (1983), did not disturb this holding. Indeed, when Congress uses in a statute a term of art with a long history of judicial interpretation, we must presume that Congress intends to use the word in its technical sense. *See INS v. St. Cyr,* 533 U.S. 289, 312 n. 35, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (citing *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952)). The term "owner" as used in the admiralty law has an established judicial gloss, stretching back to the 1790s. "It has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as the owner, generally called owner *pro hac vice.*" *Reed v. S.S. Yaka,* 373 U.S. 410, 412, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). "There is no doubt that under some forms of a charter[ ] the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and consequently becomes subject to the duties and responsibilities of ownership." *Leary v. United States,* 81 U.S. (14 Wall.) 607, 610, 20 L.Ed. 756 (1871). In a number of cases over the years, federal courts have said that a bareboat charterer is "*the* owner" of a vessel, for purposes of the wage statutes. *See, e.g., Aird v. Weyerhaeuser S.S. Co.,* 169 F.2d 606, 609–10 (3d Cir.1948) ("If the owner of the vessel has given entire possession and control of it to another ... the

---

*Id.* at 321. What the court did *not* hold was that clerical errors can constitute sufficient cause; as the court said, the plaintiffs raised challenges only to the sufficiency of the evidence, so that "the only relevant inquiry on this appeal is ... whether the findings of fact made by the District Judge were clearly erroneous." *Id.* at 320. Even if we were to try to

glean some implicit legal holding from the court's opinion, we think it is just as plausible that the court believed that the clerical errors did not rise to the level of negligence as it is to conclude that it thought that merely negligent behavior was categorically sufficient cause.

person thus put in possession and control ... becomes special owner for the voyage and assumes all responsibilities of owner with respect, inter alia, to the wages of the seamen ...."); *The John E. Berwind,* 56 F.2d at 15; *Everett v. United States,* 284 F. 203, 205 (9th Cir.1922); *see also Madeja,* 310 F.3d at 638 (citing *Everett* ). Even if the magistrate judge was right that some of these statements were dicta, they are still evidence of the historical meaning of the phrase. Thus, we may presume that Congress, when it acted in 1983, was cognizant of this interpretive background.

■ Given this framework, we are compelled to conclude that the magistrate judge was mistaken in his conclusion that Wilmington is necessarily an "owner" under the statute. Where a putative owner of a vessel enters into a demise or bareboat charter sufficient to render another entity the owner *pro hac vice* of the vessel, it is the owner *pro hac vice* that is liable for a wage penalty.

At the same time, we agree with the magistrate judge that there is good reason to construe "the owner" to include more than one entity. The Dictionary Act, as we noted, instructs that phrases given in the singular are generally presumed to include the plural. 1 U.S.C. § 1. Further, the possibility of multiple "owners," each of whom may be liable for wage penalties, would enable sailors to sue whomever holds apparent authority without needing to sort out actual ownership. Thus, we recognize that there is a strong argument, both from the case law that developed the doctrine and the language of the wage penalty statute, that the concept of an owner *pro hac vice* as the *sole* owner is limited and fact specific. As a result, we do not rule out the possibility that, for example, where the bareboat charterer is not subject to suit in the United States, and where there is a legal owner who is taking advantage of the benefits of United States law, that owner could in some circumstances be held to be one of several owners equally susceptible to wage penalties under the statute. However, there is no need for us to decide those questions today.[5]

■ We are left, then, simply to determine if ASM was in fact the "owner *pro hac vice* " of the Korea. If so, Wilmington is not a proper defendant in this case. There is no real dispute that ASM was "in complete and exclusive possession, command, and navigation" of the Korea. *Fitzgerald v. A.L. Burbank & Co.,* 451 F.2d 670, 676 (2d Cir.1971). Wilmington submitted several documents, including the charter party, to that effect,[6] and Williams' only evidence to the contrary was that Wilmington occasionally receives process, official government notices, and carbon copies of notices from the ship's mortgage holder. This evidence falls far short of

---

**5.** We note that another court has concluded that an agreement to indemnify against a wage penalty under § 10504 would be void as against public policy. *See Chung, Yong Il v. Overseas Navig. Co., Ltd.,* 774 F.2d 1043, 1052 (11th Cir.1985). That determination, if correct, would be in considerable tension with the possibility of multiple owners being liable for wage penalties. It would likely be unfair to allow a relatively blameless investor, for example, to be saddled with full responsibility for a wage penalty. The view we describe in the text, therefore, would probably lead us to reject *Chung, Yong Il,* as well. Again, however, we need not decide that question at this time.

**6.** Wilmington initially submitted its affidavits in connection with its motion to dismiss. The magistrate judge properly refused to consider those documents. But Wilmington submitted its evidence again as part of its summary judgment motion, and relied upon the absence of ownership as a basis for summary judgment.

what a reasonable finder of fact could conclude constituted proof that Wilmington, and not ASM, exercises any actual control. *See, e.g., Trammell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003). There was no evidence that anyone other than ASM takes any action in response to the notices, and the evidence Williams submitted affirmatively demonstrated that Wilmington does not pay the mortgage bills it receives.

We conclude, therefore, that on the basis of the summary judgment record any reasonable finder of fact would have had to conclude that Wilmington was not the "owner" of the Korea.

### Conclusion

For the reasons we have set out more fully above, we conclude that the magistrate judge erred in determining that Wilmington was an "owner" subject to penalties under the seaman's wage statutes. We also conclude that Wilmington is entitled to summary judgment on that basis. Accordingly, the decision of the magistrate judge in appeal number 02–9455(XAP) is reversed, and the judgment of the District Court in appeal number 02–9452(L) is affirmed.